DS1257240

**SEALED    ORIGINAL**

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

2020 JUL 13 PM 2: 04

8Y

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | § | Civil Action No. _____ |
| RICHARD GOODE | § | |
| | § | |
| AND | § | **3-20CV1845-E** |
| | § | |
| STATE OF TEXAS, ex rel. | § | ***JURY TRIAL DEMANDED*** |
| RICHARD GOODE, | § | |
| | § | **FILED IN CAMERA AND** |
| Relator, | § | **UNDER SEAL PURSUANT TO** |
| vs. | § | **31 U.S.C. § 3730(b)(2)** |
| | § | |
| Children's Medical Center of Dallas, | § | **DO NOT ENTER IN PACER** |
| Children's Health System of Texas, | § | **DO NOT ENTER IN CM/ECF** |
| Dallas County Hospital District, d/b/a | § | **DO NOT PLACE IN PRESS BOX** |
| Parkland Hospital, | § | |
| | § | |
| Defendants. | § | |
| | § | |
| | § | |

Relator Richard Goode brings this action to recover penalties and damages arising from fraudulent and illegal practices of Defendants pursuant to the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* and the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code §§36.001 *et seq.*. In support, he alleges the following:

### I.    NATURE OF THE CLAIMS

1.    Defendants Children's Medical Center of Dallas ("Children's"), Dallas County Hospital District, d/b/a Parkland Hospital ("Parkland" or "Dallas County Hospital District"), and non-party, the University of Texas Southwestern Medical School ("UT Southwestern"), defrauded Medicare and the Texas Medicaid Program by paying and accepting kickbacks intended to cause Parkland to steer patients to Children's, and the UT Southwestern physicians to order reimbursable hospital services to be performed at Children's.  By paying and receiving these kickbacks, making and accepting those patient referrals, and billing Medicaid and

1

Medicare for those kickback-induced services, Defendants violated the Medicare and Medicaid anti-kickback laws, the Stark Law, the False Claims Act, and the Texas Medicaid Fraud Prevention Act.

2.      Over a period of at least the past six years, these parties engaged in at least three kickback schemes:

(a) In the guise of a lease of agreement, Parkland Hospital transferred to Children's almost all of its pediatric patients in exchange for rent payments and ½ of any increase in the Medicaid "disproportionate share" ("DSH") payments Children's received above its 1995-6 payment, with the DSH payments continuing even after Children's stopped leasing the space. As a result, Parkland was paid rent and unearned DSH funds to abandon its constitutional obligation to treat indigent pediatric patients (for which it received tax dollars), Children's was guaranteed a large new patient base for which it could bill Medicaid and Medicare, and Medicaid and Medicare paid the higher reimbursement rate for pediatric patients to which children's hospitals were entitled;

(b) Though UT Southwestern physicians treated Children's Medicaid-eligible and uninsured patients and certified as to the Medicaid patients that they would accept the Medicaid reimbursement as "payment in full," Children's paid those physicians to make up for any shortfall between Medicaid's reimbursement and commercial insurance rates, a payment intended to induce those physicians to order ancillary and other hospital services that would be performed at Children's and reimbursed by Medicaid; and,

(c) To further induce orders for patient care, Children's provided free services to UT Southwestern physicians in the form of nurses and other advanced practice providers, hospitalists, and the residents it paid, medical providers who delivered patient services for which the UT Southwestern physicians then billed.

3.      On behalf of the State of Texas and the United States, *qui tam* Relator Richard Goode seeks civil damages and penalties under the federal False Claims Act and the Texas Medicaid Fraud Prevention Act to recover taxpayer dollars spent as a result of Defendants' pervasive fraud.

## II.     PARTIES AND NON-PARTY CO-CONSPIRATOR

4.      **Relator Richard Goode** ("Relator") is a citizen of the United States and a resident of Dallas, Texas. He is a former Chief Financial Officer of Children's Medical Center of

2

Dallas, where he worked from 2013 until 2019. Mr. Goode has direct and independent knowledge of the schemes described here. He is an original source of the information underlying this Complaint and that information has been voluntarily provided to the United States and Texas prior to the filing of this Complaint.

5. **The United States of America** funds the provision of medical care, including services for eligible citizens through its Medicare and Medicaid programs.

6. **The State of Texas** shares in funding the provision of medical care for eligible citizens through its Medicaid program.

7. **Defendant Dallas County Hospital District d/b/a Parkland Health and Hospital System** is a Texas corporation located at 5201 Harry Hines Blvd., Dallas, Texas, 75235; its registered agent for service of process is Stephen J. Roth Esq., 5200 Harry Hines Blvd., Dallas, Texas, 75235. It has a constitutional obligation to provide care to indigent patients in Dallas County, *see* Tex. Const. art. IX, sections 4, 9, and operates Parkland Memorial Hospital to provide such services. Parkland is the primary teaching hospital for the University of Texas Southwestern Medical Center at Dallas.

8. **Defendant Children's Medical Center of Dallas** ("Children's") is a Texas non-profit corporation located at 1935 Medical District Drive, Dallas, Texas 75235 and can be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas, 75201. It owns and operates a licensed acute care pediatric hospital with 490 licensed beds, as well as a 72-bed acute care pediatric hospital in Plano, Texas. Since 2014, it has operated as a component of the Children's Health System of Texas. In 2018, it filed an amended certificate of formation with the Secretary of State, changing its name to Children's Health Clinical Operations and using, as its d/b/a, "Children's Medical Center of Dallas" (as of September 27, 2018) and "Children's Medical Center Dallas Operating System" (as of August 6, 2019).

9. **Defendant Children's Health System of Texas** (f/k/a Children's Health Services of Texas and currently known as "Children's Health") is a Texas non-profit corporation and the

3

parent of Children's Medical Center of Dallas. It functions as the management company for a network of pediatric facilities, is located at 350 N. St. Paul Street, Suite 2900, Dallas, Texas, 75201, and can be served with process through its registered agent, CT Corporation System, 1999 Bryan Street, Suite 900, Dallas, Texas, 75201. Its flagship hospital is Children's Medical Center of Dallas, of which it is the sole member. It is also the sole member of various physician groups, including specifically Dallas Physicians Medical Services for Children ("DPMSC"). Children's Health System of Texas was established in 1985 to provide for the effective operation of Children's Medical Center of Dallas, a task it accomplishes by electing, removing and filling vacancies for directors at its affiliated entities (including Children's Medical Center of Dallas), approving their budgets, making long-range strategic and marketing plans, and coordinating fundraising and public relations efforts.

10. **Non-party co-conspirator University of Texas Southwestern Medical School** ("UT Southwestern") is located at 5323 Harry Hines Boulevard, Dallas, Texas, 75390; its faculty care for pediatric patients at both Parkland and Children's Medical Center of Dallas.

### III.    JURISDICTION AND VENUE

11. This action arises under the federal False Claims Act, 31 U.S.C. §§3729 *et seq.* (the "FCA"), and the Texas Medicaid Fraud Prevention Act, Texas Human Resources Code §§36.001 *et seq.* (the "TMFPA").

12. This Court has subject matter jurisdiction over the federal claims in this action pursuant to 28 U.S.C. §1331 and §1345, and 31 U.S.C. §3732, which confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

13. Relator has standing to bring this *qui tam* action under the FCA, even if Relator has suffered no injury. Relator proceeds as the Government representative or assignee to effectuate that statute's purpose of uncovering fraud against the Government. 31 U.S.C. §3730(b-d).

14. Subject matter jurisdiction over the state claims is based on 31 U.S.C. §3732(b) and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

4

15.    This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. §3732(a) and (b) because that section authorizes nationwide service of process and because Defendants have minimum contacts with the United States. Moreover, all Defendants can be found in and transact business in the Northern District of Texas, in Dallas County, Texas.

16.    Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. §1391(b), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a) because the Defendants can be found in, and/or transact or have transacted business in, this District. At all times relevant to this Complaint, Defendants regularly conducted, and continue to conduct, substantial business within this District, and/or maintain employees and offices in this District. Defendants' principal places of business are in this District, and many of the acts described in this Complaint occurred in this District.

## IV. APPLICABLE LAW AND REGULATIONS

### A.    The False Claims Act

17.    The FCA provides that any person who:

    (a)    knowingly presents, or causes to be presented a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

    (c)    conspires to defraud the Government by committing a violation of the FCA; or

    (d)    knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

is liable to the United States for a civil penalty plus three times the amount of damages sustained by the United States because of the false or fraudulent claim. 31 U.S.C. §3729(a)(1)(A), (B), (C), and (G).

### B.    The Anti-Kickback Statute

18.    To protect the integrity of federal healthcare programs from difficult to detect harms, Congress enacted, in the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), a *per se* prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to over-utilization of services or poor quality of care.

19.    Congress strengthened the AKS in 1977 and 1987 to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§ 242(b) and (c); 42 U.S.C. § 1320a-7b, Medicare-Medicaid Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

20.    The AKS has been interpreted to cover any arrangement where even one purpose of the remuneration paid, offered or accepted was intended to induce referrals of federally-reimbursable goods or services.

21.    In pertinent part, the Anti-Kickback Statute now states:

(b)    Illegal remuneration

(2)    whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

(A)    to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B)    to purchase, lease, order or arrange for or recommend purchasing, leasing or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

(3)    Paragraphs (1) and (2) shall not apply to—

(A)    a discount or other reduction in price obtained by a provider of services or other entity under a Federal health

6

care program if the reduction in price is properly disclosed and appropriately reflected in the costs claimed or charges made by the provider or entity under a Federal health care program

42 U.S.C. § 1320a-7b(b).

22.    A claim including items or services resulting from a violation of the AKS constitutes a violation of the False Claims Act if even one purpose of the remuneration was intended to induce referrals of goods or services reimbursable by federal healthcare programs. 42 U.S.C. §1320a-7b(g). Accordingly, claims for reimbursement from federal health care programs for items or services provided in connection with a violation of the AKS are *per se* false or fraudulent under the False Claims Act.

23.    Compliance with the AKS is a precondition to both participation as a health care provider in, and the right to receive payment under, Medicaid, Medicare, CHAMPUS/TRICARE, CHAMPVA, the Federal Employee Health Benefit Program, and other federal health care programs.

24.    For example, to establish eligibility and seek reimbursement from the Medicaid program, hospitals, physicians and other providers enter into Provider Agreements (similar agreements are entered into with CMS for those providers participating in the Medicare program). As part of that agreement, the provider must sign the following certificate:

> Provider agrees to abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act. The Medicaid laws, regulations, and program instructions are available through the Medicaid contractor. Provider understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicaid.

Texas Health & Human Services Commission Provider Agreement, ¶12.1(i). *See also* CMS-855B (for Clinics/Group Practices and Certain Other Suppliers); CMS-855A (for Institutional Providers); CMS-855I (Physicians and non-physician Practitioners).

25.    Any claim submitted to a federal health care program that includes charges for items or services resulting from violations of the AKS constitutes a false or fraudulent claim for purposes of the False Claims Act. 42 U.S.C. § 1320a-7b(g).

26.    The OIG has carved out specific exceptions, or "safe harbors," to liability under the AKS. For example, the "personal services/management contract" safe harbor excludes from the definition of prohibited remuneration any payments (in cash or in kind) that constitute compensation for the services of an agent, so long as the agency agreement is written and signed by the parties, and so long as it provides for a fixed amount of compensation in advance. The amount of compensation cannot take into account the volume or value of referrals or business generated between the parties and must be consistent with fair market value. Further, if the services are to be performed on a periodic or sporadic basis, the written agreement must set forth the schedule. 42 C.F.R. §1001.952(d). There is also a safe harbor for leases, but again, the lease agreement must be in writing, with the aggregate rental amount fixed in advance. The amount must be consistent with fair market value and cannot take into account the volume of or value of referrals or business generated between the parties. 42 C.F.R. §1001.952(b).

27.    Violations of the AKS are material to the government. *See, e.g., U.S. v. Medoc Health Services LLC, et al.,* 3:17-cv-02977-M, 2020 U.S. Dist. LEXIS 120351, at *27 (N.D. Tex. July 2, 2020) (claims tainted by kickbacks are *per se* false and material). Any party convicted under the AKS must be excluded from participating as a provider in a federal health care programs at least five years. 42 U.S.C. § 1320a-7(a)(1). Even if a provider is not convicted, if the Secretary of the Department of Health and Human Services ("HHS") makes an administrative finding that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period, and may consider imposing administrative sanctions of $50,000 per kickback violation. 42 U.S.C. § 1320a-7(b).

C.    The Stark Law

28.    Congress enacted the Stark Law in two parts, commonly known as Stark I and Stark II. Enacted in 1989, Stark I applied to referrals of Medicare patients for clinical laboratory

8

services made on or after January 1, 1992, by physicians with a prohibited financial relationship with the clinical lab provider. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, §6204.

29.    In 1993, Congress extended the Stark Law (Stark II) to referrals for ten additional health services. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, §13562, Social Security Act Amendments of 1994, P.L. 103-432, §152.  The Stark II amendments added services are (1) inpatient and outpatient hospital services; (2) physical therapy; (3) occupational therapy; (4) radiology; (5) radiation therapy (services and supplies); (6) durable medical equipment and supplies; (7) parental and enteral nutrients, equipment, and supplies; (8) prosthetics, orthotics, and prosthetic devices and supplies; (9) outpatient prescription drugs; and (10) home health services. *See* 42 U.S.C. §1395nn(h)(6).  Together, all services enumerated in Stark I and II are known as "designated health services" or DHS.

30.    The Stark Law bars a physician involved in a prohibited financial relationship with an entity that bills Medicare or Medicaid from referring patients to that entity.  42 U.S.C. §1395nn(a)(1)(A); 42 U.S.C. §1396b(s).  And it bars the entity—a hospital, for example—from submitting claims for payment based on patient referrals from physicians having a "financial relationship" (as defined in the statute) with the hospital so long as those claims are for DHS.  42 U.S.C. §1395nn (a)(1)(B); 42 C.F.R. §411.353(a), (b).

31.    The Stark Law broadly defines prohibited financial relationships to include any "compensation" paid directly or indirectly to the referring physician.

32.    Under the Stark Law, prohibited financial relationships are divided into two categories:  1) "ownership and investment interests" and 2) "compensation arrangements."  42 U.S.C. §1395nn(b)-(e).  A "compensation arrangement" is any arrangement involving "remuneration" paid by an entity to a physician "directly or indirectly, overtly or covertly, in cash or in kind."  42 U.S.C. §1395nn(a)(2)(B), (h)(1); 42 C.F.R. §411.354(c).

33.    Certain compensation arrangements are exempt from the Stark Law's prohibition, including personal service arrangements. However, to qualify for the personal service exemption,

the personal service or compensation arrangement must be for "fair market value," it must be set in advance, and cannot be calculated with reference to "the volume or value of any referrals," among other requirements. 42 U.S.C. §1395nn(e)(3)(A)(i), (iv).

34.     If the defendants violate the Stark Law, not only may the services rendered not be billed to Medicare or Medicaid, but all other referrals for designated health services from the physician to the entity become tainted as prohibited referrals. Civil monetary penalties of $15,000.00 for each wrongfully billed claim may be imposed, plus two times the reimbursement claimed, and the providers involved may be excluded from Medicare and Medicaid programs. Compliance with the Stark Law is a material condition of receiving payment from federally funded healthcare programs, including Medicare and Medicaid.

35.     In the 1993 amendments to Stark, Congress also extended the law's provisions to Medicaid claims. 42 U.S.C. §1396b(s) provides that in situations where a particular medical service is covered "to the same extent and under the same terms and conditions" by the Medicare program and a state Medicaid program, the federal government may not reimburse the state for Medicaid claims that would have violated the Stark Law had the claims been submitted to the Medicare program.

36.     Stark applies even though the federal government does not pay Medicaid providers directly, instead reimbursing the states for the federal share after the Medicaid providers submit claims for payment to the states. However, if a Medicaid provider knowingly or recklessly submits to a state Medicaid program claims for services that are prohibited by 42 U.S.C. §1396b(s) without disclosing the potential Stark issue, then that provider may be held liable under the FCA for causing the state Medicaid program to submit false claims for payment to the federal government.

**D.     The Texas Medicaid Fraud Prevention Act and Prohibitions on Kickbacks**

37.     The TMFPA, Tex. Hum. Res. Code §§36.001, *et seq.*, is largely modeled after the federal False Claims Act, and creates liability for anyone who, among other things:

10

(a) knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, [§36.002(1)];

(b) knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized [§36.002(2)];

(c) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning...the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as:  (i) a hospital [§36.002(4)(A)(i)];

(d) knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning…information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program [§36.002(4)(B)];

(e) knowingly makes, uses, or causing the making or use of a false record or statement material to an obligation to pay or transmit money or property to [the State of Texas] under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to [the State of Texas] under the Medicaid program [§36.002(12)]; or

(f) conspires to commit a violation of any of the above-listed unlawful acts [§36.002(9)].

*See also* Texas Medicaid Provider Procedures Manual (Vol. 1, Section 1) (April 2020), ¶1.11(11)(b)-(d) (setting forth a non-exclusive list of grounds or criteria for the administrative enforcement and/or referral for criminal, civil, or licensure or certification investigation and judicial action regarding program violations, including Stark violations).

38.     The TMFPA also contains multiple provisions making the solicitation, payment, or receipt of kickbacks illegal. A person commits an unlawful act if the person:

. . . Except as authorized by the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program.

11

Tex. Hum Res. Code §36.002(5).

> . . . Knowingly engages in conduct that constitutes a violation under Tex. Hum. Res. Code § 32.039(b).

Tex. Hum. Res. Code § 36.002 (13).

39.    A person commits a violation of §32.039(b) if the person:

(1-b) solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for referring an individual to a person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;

(1-c) solicits or receives, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind for purchasing, leasing, or ordering, or arranging for or recommending the purchasing, leasing, or ordering of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(1-d) offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to refer an individual to another person for the furnishing of, or for arranging the furnishing of, any item or service for which payment may be made, in whole or in part, under the medical assistance program, provided that this subdivision does not prohibit the referral of a patient to another practitioner within a multispecialty group or university medical services research and development plan (practice plan) for medically necessary services;

(1-e) offers or pays, directly or indirectly, overtly or covertly any remuneration, including any kickback, bribe, or rebate, in cash or in kind to induce a person to purchase, lease, or order, or arrange for or recommend the purchase, lease, or order of, any good, facility, service, or item for which payment may be made, in whole or in part, under the medical assistance program;

(1-f) provides, offers, or receives an inducement in a manner or for a purpose not otherwise prohibited by this section or Section 102.001, Occupations Code, to or from a person, including a recipient, provider, employee or agent of a provider, third-party vendor, or public servant, for the purpose of influencing or being influenced in a decision regarding:

> (A) selection of a provider or receipt of a good or service under the medical assistance program;

> (B) the use of goods or services provided under the medical assistance program; or
>
> (C) the inclusion or exclusion of goods or services available under the medical assistance program;

Tex. Hum. Res. Code §32.039(b)(1-b)-(1-f).

40.    A person also commits a violation of §32.039(b) if the person violates Occupations Code §102.001, which provides:

> (a) A person commits an offense if the person knowingly offers to pay or agrees to accept, directly or indirectly, overtly or covertly any remuneration in cash or in kind to or from another for securing or soliciting a patient or patronage for or from a person licensed, certified, or registered by a state health care regulatory agency.

Tex. Occ. Code §102.001(a).

41.    Texas's Medicaid Provider Manual provides that "People who induce, solicit, receive, offer, or pay any remuneration (including, but not limited to, bribes, kickbacks, or rebates) directly or indirectly in relation to referrals, purchases, leases, or arrangements of services covered by Medicare or Texas Medicaid may be in violation of state statutes and guilty of a federal felony offense." Texas Medicaid Provider Procedures Manual (Vol. 1, Section 1), (April 2020) §1.11.

42.    Like the federal FCA, the TMFPA allows for actions brought by private individuals on behalf of the State. Tex. Hum. Res. Code §§36.101(a), 36.052.

E.    **The Medicare Program**

43.    Medicare is a federally funded program designed to provide health care benefits to the aged and disabled. Medicare Part A covers inpatient hospital care and related services, while Part B covers outpatient physician services, as well as other non-institutional medical services. *See* 42 U.S.C. §§ 1395c-1395i-5; 42 U.S.C. §§ 1395j-1395w-20.

44.    The Department of Health and Human Services is generally responsible for the administration and supervision of the Medicare Program, responsibilities performed, in large part, by its Center for Medicare & Medicaid Services ("CMS").

13

45.    In order to prevent waste, fraud and abuse, Medicare is only authorized to pay for items and services that are medically "reasonable and necessary." 42 U.S.C. §1395y(a)(l).   The Secretary of HHS is authorized to define what services meet that criteria. 42 U.S.C. §1395ff(a). Medicaid and other federally funded healthcare programs also only pay for items and services that are medically "reasonable and necessary."

46.    Under the Medicare Program, CMS makes payments retrospectively (after the services are rendered) to hospitals for inpatient services. Medicare enters into provider agreements with hospitals in order to establish the hospitals' eligibility to participate in the Medicare Program. However, Medicare does not prospectively contract with hospitals to provide particular services for particular patients.

47.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for interim reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals submit patient-specific claims for interim payments on a CMS-1450/UB 04 or its electronic equivalent.

48.    Since March 2, 1988, Medicare regulations have expressly stated that one of the "basic conditions" for a provider to receive payment from Medicare is that the provider "must furnish to the intermediary or carrier sufficient information to determine whether payment is due and the amount of payment." 42 C.F.R. § 424.5(a)(6).

49.    Most providers are paid according to CMS's prospective payment system, in which reimbursement is based on the Diagnosis-Related Group (DRG) classification into which the service provided falls. However, children's hospitals are exempt from that program, and can still be compensated on a fee-for-service basis. 42 C.F.R. §412.23(c); 1 TAC §355.8052(b)(7).

50.    Medicare and Medicaid providers have a legal duty to familiarize themselves with program reimbursement rules, including those stated in the Medicare Manuals. A provider's failure to inform itself of the legal requirements for participation in the program acts in reckless disregard or deliberate ignorance of those requirements.  42 C.F.R. §411.406.

51.    Under the Medicare Program, CMS enters into provider agreements with hospitals in order to establish the hospital's eligibility to participate in the Medicare Program. After a Medicare patient is served, the hospital submits claims for interim reimbursement for items and services provided to the beneficiary.

52.    In addition to claims for services to individual patients, Medicare providers are required to submit annually a Form CMS-2552, more commonly known as the Hospital Cost Report, stating the amount of interim payments they have received and the amounts they believe they were entitled to receive from Medicare during the year. Hospitals must file this annual Hospital Cost Report within 150 days following their Medicare fiscal year end. *See* 42 U.S.C. §13959(c); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1).

53.    Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges during the course of the fiscal year. On the Hospital Cost Report, Medicare's liability for the services provided is then totaled with any other Medicare liabilities to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider over the course of the year are subtracted to determine the amount due to the Medicare Program or the amount due to the provider.

54.    At all times relevant to this Complaint, every Hospital Cost Report contained a "Certification" that had to be signed by the chief administrator of the provider or a responsible designee of the administrator, stating, in part:

> to the best of my knowledge and belief, it [the Hospital Cost Report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

55.    The Hospital Cost Report form (Form CMS-2552) reminds providers that: MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES

IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES AND/OR IMPRISONMENT MAY RESULT.

56.     If a hospital discovers errors and omissions in its claims submitted for reimbursement to Medicare (including its cost reports), it is required to disclose those matters to its Medicare Fiscal Intermediary. 42 U.S.C. § 1320a-7b(a)(3) creates a duty to disclose known errors in cost reports:

> Whoever . . . having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . .conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized . . . shall in the case of such a . . . concealment or failure . . . be guilty of a felony.

57.     The Medicare program depends heavily upon the truthfulness of providers in completing their cost reports. At all times relevant to this complaint it was common knowledge in the healthcare industry that the government lacks adequate resources to conduct a full-scope audit of each of all of the providers nationwide, including hospitals, which file cost reports with Medicare each year.

58.     The CMS-2552 certifications and federal regulations confirm that CMS conditions payments on the truthfulness of the statements contained in the cost report and relies on this information in determining the provider's payment. 42 C.F.R. §§413.20(e); 413.24(f).

59.     Defendants were, at all times relevant to this complaint, required by law to submit and, did submit Hospital Cost Reports (CMS-2552) and interim claim forms (UB-92) to the Medicare fiscal intermediary for Texas—Novitas Solutions, Inc.

F.     **The Medicaid Program**

60.     Structured as a joint federal-state program, Medicaid is the largest source of funding for medical and health-related services to the U.S.'s low-income population. 42 U.S.C. §§1396, *et seq.* With the passage of the Affordable Care Act, Medicaid coverage has been available to any person under the age of 65 with an income that is up to 138 times the federal

poverty level. The federal government provides matching funds to the states (the "federal financial participation" amount, or "FFP"), while ensuring that they comply with minimum standards in the administration of the program. 42 U.S.C. §1396d(a)(1)-(2); 42 C.F.R. §430.1. As with Medicare, CMS administers Medicaid at the federal level.

61.     The federal share of Medicaid program expenditures is known as the Federal Medical Assistance Percentage (FMAP); it takes into account both the total amount of matchable Medicaid expenditures and the State's average per capita income level. States with a higher per capita income level are reimbursed a smaller share of their costs, with the federal participation ranging from 50-83%. The federal government then applies a multiplier, based on the FMAP and the amount each state spends on its Medicaid program.

62.     In FY 2015, Texas's FMAP was 58.05%; in FY 2021, it will be 61.81% with a multiplier of 1.62.

63.     The remaining percentage is the state's share of Medicaid program costs. At least 40% of the state's contribution to Medicaid must be financed by state funds, with local government funds permitted to contribute up to 60% of the state's share. 42 U.S.C. §1396a(a)(2).

64.     Most states fund their share through state revenues and intergovernmental transfers ("IGTs") of local government funds such as tax revenue and publicly-owned provider funds. The state pays its share of medical assistance expenditures from state and local government funds (the IGTs) in accordance with the requirements of section 1902(a)(2) [42 U.S.C. §1396a(a)(2)] of the Medicaid Act.

65.     Though federal statutes, regulations and policies set national guidelines and minimum standards, each State establishes its own eligibility standards; determines the type, amount, duration, and scope of services; sets the rate of payment for services; and administers its own program. To qualify for federal funding, the states must meet the minimum requirements set forth at 42 U.S.C. §1396 et seq. For example, each state's Medicaid program must provide hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. §1396d(a)(l)-(2).

17

66.     While the Texas Health and Human Services Commission ("HHSC") administers Texas's Medicaid program (*see* Tex. Hum. Res. Code §§32.021(a), 32.0212, 32.024), HHSC contracts with Accenture, which in turn contracts with and supervises contractor, the Texas Medicaid and Health Partnership.

67.     To enroll in Texas Medicaid, providers must submit a Provider Information Form (PIF-1), a "Principal" Information Form (PIF-2 must be submitted if the provider has a principal), and the HHSC Medicaid Provider Agreement. *Id.* at §1.1.10.2.

68.     A provider submitting the HHSC Medicaid Provider Agreement agrees that he or she "has a duty to become educated and knowledgeable with the contents and procedures contained in the Provider Manual. Provider agrees to comply with all of the requirements of the Provider Manual, as well as all state and federal laws governing or regulating Medicaid, and provider further acknowledges and agrees that the provider is responsible for ensuring that all employees and agents of the provider also comply." HHSC Medicaid Provider Agreement at ¶I, §1.3.9.

69.     These providers also certify that "they understand[s] that falsifying entries, concealment of a material fact, or pertinent omissions may constitute fraud and may be prosecuted under applicable federal and state law. Fraud is a felony, which can result in fines or imprisonment."

70.     Providers submitting the HHSC Medicaid Provider Agreement also certify that they "agree[s] to abide by all Medicaid regulations, program instructions, and Title XIX of the Social Security Act. The Medicaid laws, regulations, and program instructions are available through the Medicaid contractor. Provider understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicaid." *Id.* at ¶12.1(i).

71.     Texas Medicaid providers must follow the coding and billing requirements of the *Texas Medicaid Provider Procedures Manual* (TMPPM). Texas Medicaid Provider Procedures Manual (Vol. 1, Section 1), (April 2020) §1.11.

72.     In Texas, Medicaid inpatient stays are reimbursed according to a "prospective payment" system (similar to that used by Medicare) in which services are reimbursed at a standard rate based on the "diagnosis-related group" ("DRG") to which the service is assigned; exceptions are inpatient stays at state-owned teaching hospitals and psychiatric hospitals. Texas Medicaid Provider Procedures Manual (Vol. 2)—Inpatient and Outpatient Hospital Services Handbook (April 2020) §3.7.3.1.

73.     Providers participating in Medicaid must accept Medicaid payment rates as payment in full. Texas Medicaid Provider Procedures Manual (Vol. 1, Section 1)—Provider Certification/Assignment (April 2020) §§1.7.9, 1.7.10. "A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual...." 42 C.F.R. §447.15 ("Acceptance of State Payment as Payment in Full"). *See also* 42 C.F.R. 438.60 ("The State agency must ensure that no payment is made to a network provider other than by the MCO, PIHP, or PAHP for services covered under the contract between the State and the MCO, PIHP, or PAHP..."); CMS, Brief Summaries of Medicare & Medicaid (Oct. 15, 2018) at 29 ("Providers participating in Medicaid must accept Medicaid payment rates as payment in full").

74.     Though federally exempt from the prospective payment system, in Texas, Children's hospitals are reimbursed for Medicaid inpatient services using the prospective payment methodology based on APR-DRG methodology; "designated children's hospitals" are entitled to receive two SBA rates—one for obstetric delivery services provided to clients over 18 years of age, and one for any other services provided to those over 18 and all services of every type provided to those under 18. Children's hospitals that are not "designated" receive one SBA

rate. Texas Medicaid Provider Procedures Manual (Vol. 2)—Inpatient and Outpatient Hospital Services Handbook (April 2020) §3.7.3.11.

75.    Outpatient hospital services are still reimbursed on a reasonable cost based on a percentage of the hospital's most recent Medicaid cost report settlement. Texas Medicaid Provider Procedures Manual (Vol. 1, Section 2)—Texas Medicaid Fee-for-Service Reimbursement (April 2020) §2.2.3. Outpatient services include those provided in the emergency room, day surgeries, services provided in the observation room, and ancillary services like laboratory, radiology, physical or occupational therapy, cardiac rehabilitation, hyperbaric chamber, infusion services, and other areas able to provide services in the outpatient setting. Texas Medicaid Provider Procedures Manual (Vol. 2)—Inpatient and Outpatient Hospital Services Handbook (April 2020) §4.1. Texas Medicaid also pays the clinic registration fee in lieu of other benefits when a hospital provides outpatient services without charge, so long as the registration fee is less than the allowed Medicaid payment. *Id.* at §4.1.2.

76.    Currently, "high volume" children's hospitals (those paid at least $200,000 in calendar year 2004) are reimbursed 76.03% of allowable charges, while other "high volume" hospitals (and are not rural or state-owned teaching hospitals) are reimbursed 72% of allowable charges. Texas Medicaid Provider Procedures Manual (Vol. 1, Section 2)—Texas Medicaid Fee-for-Service Reimbursement at §2.5.

77.    To be considered for payment, institutional providers, including hospitals, submit claims on the CMS-1450/ UB 04 form or its electronic equivalent. *See, e.g.,* Texas Medicaid Provider Procedures Manual (Vol. 2)—Inpatient and Outpatient Services Handbook (April 2020) §§3.7.1, 3.7.2, 3.7.3.1, 4.2.2, 4.2.14, 4.2.19, 4.5.1, 4.5.5, 5.4.1; Texas Medicaid Provider Procedures Manual (Vol. 1, Section 5)—Fee-for-Service Prior Authorizations (April 2020) §5.10; Texas Medicaid Provider Procedures Manual (Vol. 1, Section 6)—Claims Filing (April 2020) §6.13, 6.3.4.1, 6.6.4. 6.6, 6.6.1.

78.    To be considered for payment, individual providers, including but not limited to physicians and mid-level providers, submit claims on the CMS-1500 form or its electronic

equivalent. Texas Medicaid Provider Procedures Manual (Vol. 1, Section 6)—Claims Filing (April 2020) §§6.3.4.1, 6.5, 6.5.1, 6.13; Texas Medicaid Provider Procedures Manual (Vol. 1, Section 5)—Fee-for-Service Prior Authorizations (April 2020) §5.10; Texas Medicaid Provider Procedures Manual (Vol. 2)—Inpatient and Outpatient Services Handbook (April 2020), §5.4.1.

79.    If a nurse practitioner, physician assistant, certified nurse midwife or clinical nurse specialists performs services for children (patient is under 21 years of age and eligible for THSteps) and the physician does not make a decision about the child's care or treatment on the same date, the physician may submit the claim under his or her own provider identifier, but must add a modifier disclosing that the services were provided by a mid-level provider. Where the mid-level provides the child's services and bills for them, reimbursement is made at 92% of the established physician's reimbursement rate. Texas Medicaid Provider Procedures Manual (Vol. 2)—Children's Services Handbook (April 2020), §1.3.

80.    With each claim submitted on the CMS-1450/UB 04 form or its electronic equivalent, the submitting party certifies:

> **THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARTY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).**
>
> ...
>
> [T]hat the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts.
>
> ...
>
> For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws
>
> CMS-1450/UB 04 at 2.

81.    With each claim submitted on the CMS-1500 form or its electronic equivalent, the submitting party certifies:

21

**Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.**

...

In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark Law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license#, or SSN) of the primary individual rendering each service is reported in the designated section....

....

**MEDICAID PAYMENTS (PROVIDER CERTIFICATION)**

...I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of the authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

...

**SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: this is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

CMS-1500 at 2.

82.    When submitting a claim for payment to the Texas Medicaid program, providers must also certify that:

22

(a) Services were personally rendered by the billing provider or under supervision of the billing provider, if allowed for that provider type, or under a substitute arrangement.

(b) The information on the claim form is true, accurate, and complete.

(c) All services, supplies, or items billed were medically necessary for the client's diagnosis or treatment. Exception is allowed for special preventive and screening programs (for example, family planning and THSteps).

(d) Health records document all services billed and the medical necessity of those services.

(e) All billed charges are usual and customary for the services provided. The charges must not be higher than the fees charged to private-pay patients.

(f) The provider will not bill Texas Medicaid for services that are provided or offered to non-Medicaid patients, without charge, discounted or reduced in any fashion including, but not limited to, sliding scales or advertised specials. Any reduced, discounted, free, or special fee advertised to the public must also be offered to Texas Medicaid clients.

(g) Services were provided without regard to race, color, sex, national origin, age, or handicap.

(h) The provider of health care and services files a claim with Texas Medicaid agreeing to accept the Medicaid reimbursement as payment in full for those services covered under Texas Medicaid. In accordance with 1 TAC §354.1005, the reimbursement for services covers the costs for a covered service, and any function incidental to the provision of a covered service (refer to subsection 1.6.9, "Billing Clients" for more information). The client with Medicaid coverage, or others on their behalf, must not be billed for the amount above that which is paid on allowed services or for services denied or reduced as a result of errors made in claims filing, claims preparation, missed filing deadlines, or failure to follow the appropriate appeal process. However, the client may be billed for noncovered services for which Texas Medicaid does not make any payment. Before providing services, providers should always inform clients of their liability for services that are not a benefit of Texas Medicaid, including use of the Client Acknowledgment Statement

(i) The provider understands that endorsing or depositing a Texas Medicaid check is accepting money from federal and state funds and that any falsification or concealment of material fact related to payment may be grounds for prosecution under federal and state laws.

Texas Medicaid Provider Procedures Manual (Vol. 1)—Provider Certification/Assignment) §1.7.9 (April 2020).

83.    Falsely certifying compliance with the Stark or Anti-Kickback Acts in connection with a claim submitted to a federally funded insurance program is a violation of the FCA. *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 901 (5th Cir. 1997); *U.S. ex rel. Kosenske v. Carlisle HMA, Inc.*, 554 F.3d 88, 94 (3d Cir. 2009).

84.    As with Medicare, hospital providers that are "cost-reimbursed" must submit their costs of providing inpatient and outpatient services on an annual cost report, using the CMS cost report form (CMS-2552), reporting that must be done within 150 days of the end of their Medicaid fiscal year. Texas Medicaid Procedures Manual (Vol. 2)—Inpatient and Outpatient Hospital Services Handbook (April 2020) §3.7.4. *See also* 42 U.S.C. § 13959(c); 42 C.F.R. § 413.20; 42 C.F.R. §405.1801(b)(1). At a minimum, outpatient services are "cost reimbursed." Texas Medicaid Provider Procedures Manual (Vol. 1, Section 2)—Medicaid Fee-for-Service Reimbursement (April 2020) §§2.2.2, 2.2.3; Texas Medicaid Provider Procedures Manual (Vol. 2)—Inpatient and Outpatient Hospital Services Handbook (April 2020) §§3.7.3.1, 3.7.4. 4.5.2.

85.    Children's and Parkland file annual cost reports, using Form CMS 2552. 1 TAC §355.8065(b)(26); §355.8066(b)(13).

86.    The cost report is used to reconcile the amount of Medicaid reimbursement paid to a provider over the course of the year with the total the hospital provider claims is owed in its cost report. 1 TAC §355.8062(b)(1). If Medicaid has paid too much, the hospital must refund the overpayment. If it has paid to little, Medicaid will make a payment.

87.    Under Texas cost reporting rules, it is a violation to:

    (a) Report costs not incurred or which were attributable to nonprogram activities, other enterprises or personal expenses;

    (b) Include unallowable cost items on a cost report;

    (c) Manipulate or falsify statistics that result in an overstatement of costs or avoidance of recoupment, such as incorrectly reporting revenues received or units of service delivered;

    (d) Reporting costs above the cost to the related party.

24

Texas Medicaid Provider Procedures Manual (Vol. 1, Section 1)—Provider Enrollment and Responsibilities (April 2020) §1.11(11).

88.     Whenever a state Medicaid program is damaged by a hospital's submission of false claims or false statements, the United States is as well because it funds a portion of each state's Medicaid program.

89.     Because Texas Medicaid providers use the CMS cost report form to submit claims (CMS-2552), if a provider's cost report submission to CMS for Medicare purposes contains false or incorrect information, false statements, or false claims for reimbursement, it will contain that same false or incorrect information, false statements, or false claims for reimbursement for Medicaid purposes. *See* Texas Medicaid Procedures Manual (Vol. 2)—Inpatient and Outpatient Hospital Services Handbook (April 2020) §3.7.4 (though Texas requires some supplementary worksheets, under the Texas Medicaid program, the provider must prepare and submit "one copy of the applicable CMS Cost Report Form" to the Medicaid program Audit Department). *See also* 42 C.F.R. § 413.20; 42 C.F.R. §405.1801(b)(1).

## G.     Supplemental Medicaid Payments

### 1.     *Disproportionate Share Hospital Payments*

90.     In addition to base Medicaid reimbursement payments, hospitals providing care to Medicaid patients have been eligible to receive certain types of supplemental payments. For example, since 1981, states have been required to ensure that payments made to hospitals "take into account...the situation of hospitals which serve a disproportionate number of low-income patients with special needs." 42 U.S.C. §1396a(a)(13)(A)(iv). Those hospitals treating a "disproportionate share" of Medicaid patients are eligible for payment adjustments to provide supplemental co-reimbursement. 42 U.S.C. §1396r-4(c). The intent of this Congressional directive was to "stabilize the hospitals financially and preserve access to health care services for eligible low-income patients."

91.    The federal government accomplishes the statutory directive by distributing federal monies—known as "disproportionate share" or "DSH" payments— to each state based on a statutory formula; the states then distribute these funds to qualifying hospitals in an amount that cannot exceed the individual hospital's "costs incurred" in furnishing hospital services to Medicaid-eligible patients. 42 U.S.C. § 1396r-4(g); 1 TAC §355.8065(a); 1 TAC §355.8066(b)(8). Costs incurred are "net of payments under this subchapter, other than under this section, and by uninsured patients"; in other words, payments made by Medicaid and the uninsured individuals *must be* subtracted out when calculating a hospital's "costs incurred." Since 2017, payments made by Medicare and private insurers for those patients must also be subtracted from costs incurred. 42 U.S.C. § 1396r-4(g)(1)(A); 42 C.F.R. 447.299(c)(10) (2017); 1 TAC §355.8066(c).

92.    Due to increasing DSH costs, Congress eventually capped the federal share of payments to DSH hospitals by setting a state-specific DSH limit, while also prohibiting states from financing the state share of Medicaid payments with contributions from private hospitals. And while it recognized that the states would allocate those DSH funds to hospitals according to its state plan, it created a "hospital-specific" cap, which could not exceed the hospital's "uncompensated costs" of serving Medicaid and uninsured patients. 42 U.S.C. § 1396r-4(f), (g)(1)(A).

93.    Texas sets the hospital-specific limit on DSH payments based on information in the hospital's cost report from two years prior to each upcoming DSH award, with the DSH program year now running from October 1 to September 30. 1 TAC §355.8065(b)(11), (15) and §355.8066(b)(8), (19), (c)(1), (2).

94.    Only costs that are not otherwise paid for by the patient, by insurance, by another third party, by Medicaid, or by any other program are eligible for DSH reimbursement.

95.    Hospitals that wish to be considered for DSH payments must enroll as a Medicaid hospital, must apply for such consideration annually, and must satisfy both eligibility and qualification criteria. 1 TAC §355.8065(c), (d). However, children's hospitals that satisfy

26

§355.8065(c)'s eligibility criteria are deemed to qualify as DSH hospitals, even if they would not otherwise have satisfied the qualification criteria in §355.8065(d). 1 TAC §355.8065(d)(4).

96.    In addition to DSH payments, hospitals treating Medicaid patients may be eligible to receive supplemental "uncompensated care" ("UC") payments.

97.    In Texas, DSH or UC supplemental payments are made from fixed pools. Though Texas funds the state portion of the base Medicaid reimbursement payments from its general revenue fund, the state's financial contribution to supplemental payment programs like DSH and UC comes from intergovernmental transfers ("IGTs") made to the state from hospital districts, counties, and certain state-owned entities. Overall, general revenue finances about 50% of the state's contribution to Medicaid, with IGTs financing the other 50%.

98.    An IGT made by or on behalf of a public hospital is an expenditure that reduces the amount of Medicaid revenue available to run the public hospital's operations and serve its patients. "Accordingly, IGTs made by or on behalf of public hospitals may be considered an offset against payments in the assessment of Medicaid payment adequacy"; that is, in calculating the Medicaid shortfall.

99.    Years ago, however, the Health Care Financing Administration (CMS's predecessor agency) became concerned that states were using private provider donations to fund the non-federal share of Medicaid payments, effectively circumventing their obligation under the Medicaid Act to expend funds for medical assistance. *See* Medicaid Program; State Share of Financial Participation, 56 Fed. Reg. 46,380, 46,382 (Sept. 12, 1991).

100.    Federal law mandates that all such donations be reported to the federal government and be documented. 42 C.F.R. §433.74. Federal law also mandates that at the administrative level, where the existence and amount of such donations are reported, federal participation in Medicaid funding must be reduced in proportion to the amount of all provider-related donations that are not bona fide within the meaning of the regulations. 42 C.F.R. §§433.66, 433.74(d). No discretionary exceptions exist. Reducing the federal government's

financial participation is an administrative remedy that does not preclude additional remedies against wrongdoers who knowingly violate the False Claims Act.

101. A reduction in the federal government's financial participation will not occur if a state receives "provider-related donations" (in cash or kind) made by, or on behalf of, health care providers if the donations are "bona fide" donations or meet out-stationed eligibility worker donation requirements (which are not relevant here). 42 C.F.R. §433.67(b). The HHS Secretary has the discretion to determine what constitutes a "bona fide donation." 42 U.S.C. §1396b(w)(2)(B).

102. The Secretary has exercised this discretion to enact rules providing that a provider-related donation made to a state or unit of local government is "bona fide" only if it has no direct or indirect relationship to Medicaid payments to the health care provider, any related entity providing health care items and services, or other providers furnishing the same class of items or services as the provider or related entity. Provider-related donations are deemed to have no direct or indirect relationship to Medicaid payments only if those donations are *not* returned to the individual provider, the provider class, or any related entity under a "hold harmless provision or practice" as those terms are described in the regulations. 42 C.F.R. §433.54(a) & (b).

103. A hold harmless practice that destroys the bona fide nature of a donation exists if any of the following applies:

1. The State (or other unit of government) provides for a direct or indirect non-Medicaid payment to those providers or others making, or responsible for, the donation, and the payment amount is positively correlated to the donation. A positive correlation includes any positive relationship between these variables, even if not consistent over time.

2. All or any portion of the Medicaid payment to the donor, provider class, or related entity, varies based only on the amount of the donation, including where Medicaid payment is conditional on receipt of the donation.

3.     The State (or other unit of government) receiving the donation provides for any direct or indirect payment, offset, or waiver such that the provision of that payment, offset, or waiver directly or indirectly guarantees to return any portion of the donation to the provider (or other parties responsible for the donation).

42 C.F.R. §433.54(c).

104.     Guidance from CMS explains that where a governmental unit, such as Dallas County Hospital District, cedes its responsibilities to a private entity through a provider arrangement, this would not be bona fide. "Any arrangement…that obligate[s] a private hospital to either assume the programmatic responsibility of a unit of government **or sign lease agreements** at an amount that is greater than fair market value would be considered a hold harmless arrangement. The donation would not be considered bona fide when such arrangements are tied *in any way*, directly or indirectly, to Medicaid reimbursement under the Medicaid state plan." Cindy Mann, CMS State Medicaid Director Letter, SMDL No.14-004 (May 9, 2014) (emphasis in original and added).

105.     Each year, Texas must report to HHS all private provider donations made to it, or to local governments, so that an evaluation of their bona fides can be made and any appropriate reductions in federal participation can be made. 42 U.S.C. §1396b(d)(6)(A)(i); 42 C.F.R. §433.74(a).

106.     Thus, as private entities, hospitals like Children's should not make IGTs to fund the DSH or UC pools from which they receive supplemental payments.

107.     To ensure that they don't, Texas requires each private hospital receiving payments from a Medicaid supplemental payment program to enter into an affiliation agreement with a governmental entity that does make IGTs, further requiring that each hospital and its affiliated governmental entity certify to Texas HHSC that no supplemental payments or other funds in consideration of supplemental payments will be returned or reimbursed to the governmental entity. 1 Tex. Admin. Code §355.8201(c)(1)(B)(i)(II), (ii)(I); 42 C.F.R. §433.57, §433.66.

Texas HHSC records confirm that the Dallas County Hospital District is affiliated with Children's.

108. This certification is consistent with Texas Medicaid statutes, which expressly state that Medicaid payments—whether made to patients or providers—are not transferable or assignable at law or equity. Tex. Hum. Res. Code §32.036(a).

109. In Texas, the private hospital must certify that "All claims filed by Hospital for reimbursement by Medicaid have complied and will comply with the applicable state and federal regulations," and that "No funds derived from any Supplemental Payment received by Hospital have been or will be returned or reimbursed to the Local Governmental Entity." Finally, it must certify that it has not "[t]aken assignment or agreed to take an assignment of a contractual or statutory obligation of the Governmental Entity; or [a]uthorized or consented to the assumption of a statutory or contractual obligation of the Governmental Entity by an Affiliated Hospital or any other entity acting on behalf of an Affiliated Hospital or group of Affiliated Hospitals." Certification of Hospital Participation, HHSC (2012). Submission of this certification is necessary to receive any Medicaid supplemental payment. 1 Tex. Admin. Code §355.8201(c)(1)(B).

110. The participating governmental entities, in this case Dallas County Hospital District, were required to sign their own certification of participation, certifying that "All transfers of Public Funds…to HHSC to support the Supplemental payments to the Affiliated Hospitals under the Supplemental Payment Program [IGTs] comply with…[t]he applicable regulations that govern provider-related donations codified at section 1903(w) of the Social Security Act (42 U.S.C. § 1396b(w)), and Title 42, Code of Federal Regulations, Part 433, subpart B, Sections 433.52 and 433.54…" and that "[t]he Governmental Entity does not and will not at any time receive any part of the supplemental payments that are made by HHSC to the Affiliated Hospitals…" The governmental entity also certifies that it has not "[a]uthorized or consented to the assumption of a statutory or contractual obligation of the Governmental Entity

30

by an Affiliated Hospital or any other entity acting on behalf of an Affiliated Hospital or group of Affiliated Hospitals."

111.    A Governmental Entity must also certify that it "has not received and will not receive any cash or in-kind transfers from an Affiliated Hospital or any other entity acting on behalf of an Affiliated Hospital or group of Affiliated Hospitals other than transfers and transactions that...are unrelated to the administration of the Waiver Program or the delivery of indigent care services under an Affiliation Agreement...[that] [c]onstitute fair market value for goods or services rendered or provided by the Governmental Entity to an Affiliated Hospital; or... [that] [r]epresent independent, bona fide transactions negotiated at arms-length and in the ordinary course of business between the Affiliated Hospital and the Governmental Entity." Certification of Governmental Entity Participation for Hospital Affiliates.

112.    In other words, under these rules, if Children's affiliates with Parkland for the purpose of receiving supplemental Medicaid DSH or UC payments, it cannot then agree to refund to Parkland any portion of the supplemental payments received to offset the IGTs that Parkland contributed to the State of Texas. Such an arrangement is commonly referred to as "pay to play."

113.    The Texas Health and Human Services Commission relays the information it receives from providers through such certifications to CMS, meaning that providers—including Defendants here—knew that their actions would cause such certifications to contain false and fraudulent statements that CMS would rely upon when disbursing Medicaid supplemental funds.

114.    CMS considers compliance with the certification requirements material due to the threatened above-described loss of federal participation funds. Not only were the 1991 amendments to the Social Security Act intended to prohibit such private contributions because they had driven a significant increase in federal supplemental payment obligations, *see* 42 U.S.C. §1396b(w)), but in 2018, for example, CMS withheld more than $25 million in supplemental Medicaid payments to Texas after finding that a portion of the state's contribution to the

supplemental Medicaid payment pool was funded by private hospital contributions funneled to HHSC through IGTs from recipient local governmental entities.

### 2.    *Uncompensated Care Payments*

115.    In addition to the DSH program, an Uncompensated Care ("UC") payment is the other way the government subsidizes losses due to Medicaid shortfalls and uninsured patients.

116.    Uncompensated care is defined as the unreimbursed costs associated with services provided by hospitals to the financially or medically indigent. Put another way, it is the cost of Medicaid services plus those provided to uninsured patients, less payments received.

117.    Payment shortages comprising uncompensated care are of two basic types— charity care and bad debt. Charity care is comprised of unreimbursed costs to hospitals for services provided to low income patients for free or at reduced prices, while bad debt is uncollectible inpatient and outpatient charges that result from the extension of credit to the patient after the facility expected payment for the care.

118.    Providers may receive one of three types of payments to compensate them for uncompensated care—patient-specific, lump sum payments, and Medicaid supplemental payments.

119.    Like DSH payments, Uncompensated Care payments are drawn from pool of funds discussed above, financed through IGTs. 1 TAC 355.8212(f).

120.    Only private providers that have an executed indigent health care affiliation agreement on file with HHSC, and that participate in a Regional Health Care Partnership (with some exceptions) are eligible for payments from the UC Pool.

121.    An eligible provider qualifies for UC pool funds by applying to HHSC and submitting cost and payment data for services eligible for reimbursement under the pool—the cost data disclosed in the hospital provider's Medicare/Medicaid cost report (CMS-2552). 1 TAC §355.8212(g)(1).  No provider is paid in excess of estimated uncompensated care costs as demonstrated on the UC Applications.

122. Payments are distributed within each pool based on each provider's allowable UC costs as a percentage of all allowable UC costs for providers in the pool. A hospital's maximum UC payment is the sum of four components: 1) the inpatient and outpatient charity care costs as reflected on the UC payment application (CMS 2552, Schedule S-10), reduced by DSH payments; 2) charity care provided by physicians and mid-level providers that is related to hospital care; 3) necessary adjustments to the cost report data; and 4) for large public hospitals, the amount transferred to HHSC to support DSH payments (the IGTs). 1 TAC §355.8212(g)(2)-(5).

H.    Indigent Health Care

123. In Texas, counties are obligated to provide select medical care to all of their residents who are at or below 21 percent of the Federal Poverty Level, have an income that is less than $2,533 for a single-person household in 2017, who do not qualify for other government health care programs, and have resources that total less than $2,000. The Texas Department of State Health Services oversees this law.

124. Specifically, Texas counties are required to provide "basic healthcare services"—including inpatient and outpatient hospital services and physician services—to "eligible county residents," as defined in and determined by §§61.002(3), 61.003-61.008, 61.023 of the Health & Safety Code, up to a per-eligible person cap of $30,000. Tex. Health & Safety Code §§61.022; 61.028(2), (6), 61.035. In its discretion, the county may also provide other medically necessary health care services. *Id.* at §§61.028, 61.0285.

125. Counties spending at least 8% of their general revenue funds to provide healthcare services may obtain assistance from the Texas's indigent health care fund, with the aggregate assistance capped at the amount appropriated by the legislature. *Id.* at §§61.037, 61.038, 61.0395.

126. Counties may satisfy their obligation to provide healthcare services through a public hospital or by affiliating with a hospital district; both are obligated to provide health care assistance to eligible residents in their service areas. *Id.* at §§61.029(b), 61.052, 61.054, 61.055.

33

127.    The Texas Constitution authorizes counties to provide health care for their indigent residents, and for the creation of county-wide hospital districts like the Dallas County Hospital District to assume such duties as well; upon creation, they "shall assume full responsibility for providing medical and hospital care to needy inhabitants of the county..." Tex. Const. art. IX, sections 4, 9. These districts have the power to issue bonds and levy taxes to, among other things, create county hospitals like Parkland. *See, e.g.,* Tex. Const. art. IX, sections 4.

128.    Hospital districts have a legal obligation to provide health care services within their service area. Tex. Health & Safety Code §61.002 (11). Governmental entities that own, operate or lease public hospitals to provide health care services must submit reports disclosing the expenditures made to provide health care services, the type of services provided, and the relevant characteristics of eligible residents. *Id.* at §61.009. If the hospital district adopts a property tax rate that exceeds the rate calculated under Tax Code §26.04 by more than 8%, and if a portion of the tax rate was designated to provide revenue for indigent health care services, "the revenue produced by the portion of the tax rate designated for that purpose may be spent only to provide indigent health care services." *Id.* at §61.010.

129.    "[B]eginning on the date on which taxes are collected for the [county hospital] district, the district assumes full responsibility for furnishing medical and hospital care for indigent and needy persons residing in the district." Texas Health & Safety Code §281.046. Toward that end, it must "endeavor to provide the basic health care services a county is required to provide under Section 61.028, together with any other services required under the Texas Constitution..." Tex. Health & Safety Code §§61.055, 281.0282(a). Once a hospital district has been created, no other political subdivision within the boundaries of a hospital district may expend funds for any type of medical care, not just medical care for the needy. Tex. Op. Att'y. Gen. No. JM-1052 (1989); Tex. Const. Art. IX, §9.

130.    The Dallas County Hospital District that operates Parkland has levied taxes to perform these obligations. In 2015, the total adopted tax rate was the 28.6 cents for every $100

34

valuation, declining to 27.94 cents in 2016-18, and to 26.95 cents in 2019; under the Constitution, it is authorized to levy up to 75 cents for $100 valuation. In 2017, tax revenue for the district was $576 million, while the district received $173 million in governmental program revenue.

131. Children's provides services to the indigent children of Dallas County under an agreement with the Dallas County Hospital District.

## V. DEFENDANTS' UNLAWFUL ACTS

### A. The Relationship Among Defendants

132. Parkland Hospital—Dallas's county hospital—got its start in 1893 and is now one of the largest publicly funded teaching hospitals and health care systems in the United States. It is owned and operated by the Dallas County Hospital District, a special taxing unit created by the Legislature that is coterminous with Dallas County. Governed by an independent board of managers appointed by the Dallas County Commissioners Court, it is financed, in part, by a tax levy imposed on residents, the revenue from which funds indigent health care in the county.

133. Parkland is the primary teaching hospital for UT Southwestern Medical School, founded in 1943, when its students were taught in temporary army barracks behind the hospital. A long-term agreement between Parkland and the medical school assigns to the UT Southwestern faculty the responsibility to provide diagnosis and treatment for Parkland's patients, supervise patient care, and to serve as the exclusive provider of care for Parkland's patients, the majority of whom are indigent.

134. As of 2013, Parkland paid UT Southwestern approximately $160 million a year for those services. In 2004, UT Southwestern indicated to Parkland that if it received additional Medicaid funding, its need for funding from Parkland would be reduced.

135. The seventh-largest pediatrics hospital in the nation, Dallas-based Children's Medical Center is a multispecialty inpatient and outpatient facility equipped with state-of-the-art resources. Founded in 1913 as an open air clinic for babies located on the lawn of the old

Parkland Hospital, by 2017, Children's Medical Center was handling almost one million patient encounters annually at its two full-service hospital campuses in Dallas and Plano, multiple specialty clinics, and MyChildren's locations that provide primary care to children across the Metroplex.

136.    Since 1964, Children's has been affiliated with UT Southwestern Medical Center, whose faculty physicians see and care for the young patients at Children's, its primary pediatrics clinical partner.

137.    Though Parkland has recently built a new campus, both UT Southwestern and Children's are physically attached to Parkland.   Both Parkland and Children's are "institutional partners" of UT Southwestern.

**B.    Disguising Its Payments as Rent, Children's Has Been Paying Kickbacks to Parkland for Years**

138.    As a county hospital operated by the Dallas County Hospital District, Parkland has a constitutional and statutory duty to provide medical care to the indigent in Dallas County. *See* ¶¶2(a), 7, *supra*; Tex. Const. art. IX, sections 4, 9.   Nevertheless, since 1995, all Parkland patients under the age of 13 have been treated at Children's, with the exception of pediatric burn patients.

139.    On January 23, 1996, the Dallas County Commissioners Court approved a "Purchase and Lease Agreement" between the Dallas County Hospital District and Children's Medical Center of Dallas.   Effective on February 1, 1996, among its terms was a provision by which Children's would lease from Parkland the portion of its hospital housing the pediatric and pediatric intensive care units—about 34,000 square feet of space on the second and third floors of Parkland Hospital, 5201 Harry Hines Boulevard, Dallas, Texas.   The initial lease was for a six-year term, with four subsequent amendments extending it through August 31, 2009.

140.    Parkland did not ask for a security deposit, but Children's did pay an annual rental payment of $655,083, which was set forth in advance in ¶7 and Exhibit B to the Lease. This amounted to a monthly rental of about $1.60 per square foot of hospital space per month (or

about $11,700 per bed per year). Paragraphs 6.1 and 6.2 obligated Parkland to pay for all current construction projects, while Children's was obligated to pay for all other improvements occurring during the lease term.

141. Pursuant to the lease, Children's agreed to use Parkland's space for "inpatient hospital, medical and uses related or incidental to" the treatment of pediatric patients. The lease was not for office space.

142. In fact, though styled as a lease, the purpose of the Lease Agreement was to "*provide for transferring specific **responsibilities and services** from Parkland Hospital to Children's Medical Center.*" To that end, ¶17 of the Lease purported to "transfer" 46 inpatient beds and 10 intensive care beds from Parkland's license to Children's license.

143. Paragraph 5.2 of the Agreement obligated Children's, as lessee, to "provide indigent hospital services for all indigent pediatric inpatients of Dallas County without seeking payment from Lessor for such services." Again—these are patients that Parkland has a constitutional and statutory duty to treat, treatment the residents of the Dallas County Hospital District paid Parkland to provide through their tax dollars. *See* ¶¶2(a), 7, *supra*; Tex. Const. art. IX, sections 4, 9.

144. Having Children's treat these pediatric patients instead of Parkland increased the reimbursement payments for which the provider is eligible. Children's hospitals are exempt from the "Prospective Payment System" under the Medicare program and are instead reimbursed on a cost basis, pursuant to which a hospital is paid for an inpatient stay based on a set rate with a subsequent settlement payment made to ensure that the hospital receives 100% of the costs incurred for that stay. The same was true with Texas Medicaid until at least 2013, when reimbursement for inpatient services transitioned to the All Patient Refined Diagnosis Related Groups System ("APR-DRGs") (outpatient services are still reimbursed on a cost basis). While payment for a case under the APR-DRG system is primarily a function of the relative weight (intensity of the consumption of resources) of the DRG multiplied by a Standard Dollar Amount (SDA), there are separate SDAs for children's hospitals.

145.    As for insured patients, pursuant to ¶¶5.9 and 5.10 of the Lease Agreement, the Dallas County Hospital District contracted to utilize Children's as a preferred provider for pediatric inpatient and surgical services for all managed care arrangements into which it entered (with Medicaid, private insurers, and others), while also promising to compensate Children's "for services provided...[for these patients] at market rates to be negotiated by the parties, but not to exceed the local market rates paid by insurance company to health care providers for the same or similar purposes."

146.    The annual $655,083 rental payment was not Children's only financial obligation under the lease. Pursuant to ¶7.4 of the lease, Children's promised to pay Parkland 50% of all "Disproportionate Share" ("DSH") supplemental Medicaid funds that it received each year in excess of what it received in the 1995-1996 program year (the last year before the lease took effect).[1]  So, if Children's received $100,000 in DSH funds in 1995 but received $200,000 in 1997, it was obligated to pay Parkland $50,000 under ¶7.4 of the lease (50% of the additional $100,000). If the DSH program was discontinued, Children's was obligated to pay Parkland out of monies received through any similar program. The DSH payments were generally disguised, "paid" in the form of an "offset" to amounts Parkland owed Children's for the provision of patient services.

147.    These DSH payments, which were not fixed in advance, were substantial. In 1992, Children's received $1,537,290 in DSH payments. Its 1999 DSH payments were $13,957,142.

148.    Between 2010 and 2019, Children's Dallas hospital received the following amounts in DSH payments:

| | |
|---|---|
| 2019 | $15,885,326.90 |
| 2018 | $18,354,332.69 |
| 2017 | $21,660,699.39 |

---

[1] As set out in Section IV.G.1., *supra*, DSH funds are allocated to the states by the federal government, and then distributed to qualifying hospitals by the states.

| 2016 | $20,296,255.62 |
|------|----------------|
| 2015 | $22,569,280.28 |
| 2014 | $21,118,268.89 |
| 2013 | $18,075,266.93 |
| 2012 | $38,088,114.91 |
| 2011 | $24,703,304 |
| 2010 | $25,073,000 |

149.    The lease of *space* terminated on August 31, 2009. However, Children's continued to treat Parkland's pediatric patients, including its indigent patients, and to distribute to Parkland 50% of the DSH payments received in excess of the 1995-96 DSH amount. (Beginning in about 2016, Children's began to take the position that the excess DSH payment was not owed, while also maintaining that Parkland was systematically underpaying it for patient services. But Parkland continued to book and demand those excess DSH payments until late 2018 or early 2019. At that time, the two parties entered into a settlement of their dispute over Children's continuing obligation to make that DSH payment, as well as Parkland's obligation to make reimbursement to Children's for patient services, with Parkland receiving either a payment for the excess DSH amounts owed or a credit for those amounts as against the amount Children's claimed it owed in patient services reimbursement. The obligation to make the excess DSH payments only ended after that settlement).

150.    The fact that Children's continued to pay Parkland the 50% of excess DSH payments even after it ceased to lease beds from Parkland confirms that this payment, originally mandated by ¶7.4 of the contract, was a payment for patients, not beds.

151.    The lease between Parkland and Children's, and the "excess DSH" payment obligation that persisted even after Children's need for the space ended, is a "suspect arrangement" as contemplated in a 2000 Special Fraud Alert on the rental of space in physicians' offices published by the Office of Inspector General ("OIG"). In that alert, OIG expressed its concern that providers were crafting rental agreements that provided for rental payment that were

39

actually disguised kickbacks intended to induce referrals. Among the specific examples of "suspect arrangements" were those in which rental amounts "are conditioned upon the supplier's receipt of payments from a Federal health care program" (like the excess DSH payments), and those agreements providing for the payment of rent "when the rented space is not in use by the supplier," or "for space that is not necessary or not used." Notice, Office of Inspector General, Publication of OIG Special Fraud Alert on Rental of Space in Physician Offices by Persons or Entities to Which Physicians Refer, 65 Fed. Reg. 9274, 9276 (Feb. 24, 2000). The Children's-Parkland lease is suspect on each of these grounds.

152.    Children's rebate to Parkland of 50% of the DSH payments received in excess of the pre-lease DSH payments of 1995-6 constituted a non-bona fide provider-related donation which also violated the certifications that both Parkland and Children's made pursuant to the affiliation agreement between them, an agreement which stipulated that DSH payments would not be returned to or reimburse the governmental entity making any intergovernmental transfers ("IGTs") made to the state to fund the state's Medicaid contribution. 42 C.F.R. §433.57, §433.66, §433.54; 1 Tex. Admin. Code §355.8201(c)(1)(B)(i)(II), (ii)(I).

153.    Because one purpose of the lease payments was to induce the continued steering of patients from Parkland to Children's, the ¶7.4 payments constituted illegal remuneration, violating the False Claims Act, the Anti-Kickback Statute and the Texas Medicaid Act.

154.    The safe harbor for space rental does not save this transaction because the aggregate rental amount was not fixed in advance, but instead varied according to the amount of DSH payments Children's received each year. Further, since the amount of DSH payments Children's received each year was a function of the volume of its annual cost of service, which in turn varied according to the volume of patients treated, the payment of "excess DSH" took into account the volume of or value of referrals or business generated between the parties, making the transaction ineligible for safe harbor treatment. Finally, because the excess DSH payments were made even after Children's stopped renting space from Parkland, it is clear that they were not

compensation for the space rental at all, meaning that the aggregate rental provided in the rental agreement was not consistent with fair market value.  42 C.F.R. §1001.952(b).

**C.      Children's Offers Subsidies to UT Southwestern's Physicians to Induce Them to Treat its Patients and Order Additional Services Reimbursed by Medicaid**

155.    Children's operates two primary hospital campuses—one in the Dallas Medical District and the other in Plano—which provide inpatient services and outpatient hospital services.  It also operates multiple outpatient clinics (both on and off the hospital campuses) including the Pre-op Clinic, the Heart Failure Clinic, the Abdominal Pain Clinic, the Children's Health Bariatric Surgery Clinic, and the Center for Pediatric Pectus and Chest Wall Anomalies Clinic, to name a few.  Patient care ranges from simple eye exams to specialized treatment in areas such as heart disease, hematology/oncology, and cystic fibrosis. In addition, Children's Health is a major pediatric kidney, liver, heart, and bone marrow transplant center.  It employs about 8,000 people and has annual revenue of about $1.75 billion; of the 300,000 individual patients it has treated, about 2/3 are beneficiaries of Medicare, Medicaid, or other government programs.

156.    UT Southwestern operates a School of Medicine whose physician faculty members provide administrative, clinical, research, teaching, community services and professional services at the Hospital pursuant to an Affiliation Agreement between the two, and by virtue of their status as members of the Hospital's medical staff.  It employs about 17,000 employees and has annual operating revenues of about $2.7 billion.

157.    UT Southwestern also provides physician services at Parkland, and at its own private referral hospitals (Zale Lipshy, and now, the William P. Clements Hospital).

158.    The UT Southwestern physicians are responsible for 80-90% of the revenues at Children's flagship hospital in downtown Dallas. Their services would be difficult to replace; as Children's CEO Christopher Durovitch stated in October 2019, the demand for pediatric specialists is "mind-boggling."  Therefore, Children's has developed a variety of incentives to

induce those physicians to treat Children's patients, as opposed to those at Zale Lipshy, Parkland, or one of UT Southwestern's other affiliated hospitals.

### 1. Children's pays to "top up" the UT Southwestern physicians Medicaid reimbursement to the level that would be paid by commercial insurers

159.    During the 1990s, Children's and UT Southwestern entered into a Master Services Agreement to govern the terms on which each would provide services to the other. During the intervening years, Children's and UTSW have developed "side agreements" that constitute ongoing agreements to pay kickbacks.

160.    For example, Children's and UT Southwestern entered into a funds flow arrangement, in which Children's agrees to "make whole" the UT Southwestern physicians for treating its Medicaid patients.

161.    Pursuant to the agreement, UT Southwestern submitted a monthly accounting to Children's in which it would total the number of physician relative value units ("RVUs") provided to Children's Medicaid-eligible patients.

162.    For billing purposes, each service provided to a patient is assigned either a Healthcare Common Procedure Coding System [HCPCS] code or a Current Procedural Terminology [CPT] code, and each CPT or HCPCS code has a number of RVUs assigned, reflecting the intensity of the resource investment required to provide the service. If a physician performs 10 tonsillectomies in a day, and the code for that service represented 10 RVUs, the physician would have performed 100 RVUs of work on that day. Texas Medicaid uses the RVUs assigned by CMS to determine per/code reimbursement amounts).

163.    The monthly accounting did not itemize the RVUs provided by patient, service or physician. Children's would then pay UT Southwestern a flat fee for each RVU in an amount that Relator knows represents the commercial insurance per-RVU reimbursement rate. If UT Southwestern's physicians provided 1,000 RVUs to Children's Medicaid-eligible patients in a given month, Children's would pay an amount equal to 1,000 x the flat fee. In this way, UT Southwestern was assured that its physicians would be reimbursed as if the Medicaid patient had

42

been commercially insured. Relator recalls the flat fee being $55-$65/RVU, meaning that for every 1,000 RVUs worked, Children's paid UT Southwestern $55,000-65,000.

164. Children's Uncompensated Care funds are used to make these payments, referred to as "Medicaid Make Whole" payments; again—their purpose is to provide "parity" between Medicaid and commercial insurance payers. Relator knows that the reconciliation was done on a monthly basis.

165. This subsidy can be significant. For example, using 2013 data, the Texas Medical Association published research in 2016 finding that for every dollar paid by Medicare for a "non-facility" (professional physician fee) surgical service, private insurance paid, on average, $1.17 and Texas Medicaid paid $.57, less than half the private reimbursement amount. For every dollar Medicare paid for non-facility "evaluation and maintenance services" (typically, office visits), private insurance paid, on average, $1.15 and Texas Medicaid paid $.61. T. Krause et al., "Private Carriers' Physician Payment Rates Compared With Medicare and Medicaid," *The Journal of Texas Medicine* (June 2016), Table 5.

166. Making the UT Southwestern physicians "whole" violates Medicare and Medicaid rules because physicians treating patients and receiving payment under those systems agree to accept the reimbursement received from those public programs as payment in full: "Medicaid reimbursement is considered as payment in full for those services covered under Texas Medicaid. In accordance with 1 TAC §354.1005, the reimbursement for services is intended to cover the costs for a covered service, or any function incidental to the provision of a covered service." Texas Medicaid Provider Procedures Manual (Vol. 1, Section 1)—Provider Certification/Assignment (April 2020) §§1.7.9, 1.7.10. "A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual...." 42 C.F.R. §447.15 ("Acceptance of State Payment as Payment in Full"). *See also* 42 C.F.R. 438.60 ("The State agency must ensure that no payment is made to a network provider other than by the MCO, PIHP, or PAHP for services

covered under the contract between the State and the MCO, PIHP, or PAHP..."); CMS, Brief Summaries of Medicare & Medicaid (Oct. 15, 2018) at 29 ("Providers participating in Medicaid must accept Medicaid payment rates as payment in full").

167.    Worse, upon information and belief, the UT Southwestern physicians also billed Medicaid for the Children's patients served—the same patients whose RVUs would be tallied and presented to Children's for payment each month.  This means that UT Southwestern was not just being paid a kickback to "top up" reimbursements from Medicaid to the commercial per/RVU amount, it was *double dipping,* being paid twice on one claim.

168.    No safe harbor saves this "make whole" payment program either.  While there is a safe harbor for "personal services," it does not apply here because the value to be paid to UT Southwestern was not fixed in advance in a written agreement, and because the monthly payments were based entirely upon the volume of services being provided to the Children's Medicaid patients. 42 C.F.R. §1001.952(d).

169.    This arrangement was not only illegal because it constituted a kickback, but because it violated the self-referral prohibitions set forth in the Stark Law. When Children's contracted with UT Southwestern to assure that the latter's physicians would treat Children's patients, the two parties created a non-exempt financial compensation relationship that legally barred the UT Southwestern physicians from referring patients to Children's for specific treatment or services.  Making such referrals, and accepting them, violated both the Stark and Anti-Kickback statutes, and rendered the claims submitted for such patients false because their accompanying certifications were false.

170.    Each time a UT Southwestern physician submitted a reimbursement claim to Medicare or Medicaid, he or she did so on a CMS-1500 form or its electronic equivalent, certifying:

**MEDICAID PAYMENTS (PROVIDER CERTIFICATION)**

...I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the

44

exception of the authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

CMS-1500 at 2.

171.    By making a "Medicaid Make Whole" payment to UT Southwestern, Children's knowingly caused its physicians to submit false claims for reimbursement. Children's knew the UT Southwestern physicians would submit claims for payment to Medicaid because it was the submission of those claims and the payment of reimbursement that triggered Children's "make whole" payment to UT Southwestern—it was the reimbursement amount received that allowed Children's to calculate the amount necessary to bring the physician's reimbursement up to the amount that would be paid by commercial insurance. Though the UT Southwestern physicians submitted the reimbursement claims, Children's knowingly caused them to be submitted.

### 2.    *Children's provides free services to the UT Southwestern physicians, who then bill for them*

172.    Children's makes a variety of payments to UT Southwestern throughout the year. For example, pursuant to a "Leased Agreement" with UT Southwestern, it paid $21.9 million in FY 2018 for "leased time & staffing," faculty compensation, benefits, travel and continuing medical education, $3.1 million for call coverage for the surgery, plastics and Cardiac, Vascular, and Thoracic Surgery units, and $5.9 million for faculty recruitment. "CHST-UTSW Economic Work Stream, Purchased Services: Medical Administration" at 13, 17. Relator also knows that Children's pays 100% of the salary of Dr. Maeve Sheehan, Vice Chair for Clinical Operations.

173.    Children's also provides UT Southwestern with a variety of "free services." When the UT Southwestern physicians treat Children's patients at one of its hospital campuses or in one of its clinics, Children's pays the salaries and benefits for UT Southwestern's residents, and for the advanced practice providers ("APPs"—nurse practitioners, physician's assistants, etc.), all at no cost to UT Southwestern or its physicians. Through its ownership interest in Dallas Physicians Medical Services for Children ("DPMSC"), it also employs hospitalists who treat patients at Children's.

174. For example, though UT Southwestern has more than twice as many employees as Children's, and though Children's annual revenue is only 2/3 that of UT Southwestern, Children's pays the salaries and benefits for at least 250 APPs, making them available to the UT Southwestern physicians so that the APPs can provide direct patient care throughout the hospital, particularly in the neonatal (NICU), pediatric (PICU) and cardiac (CICU) intensive care units.

175. Children's spends approximately $20 million per year in payroll and benefit costs for these APPs. In FY 2019, for example, it paid about $4 million in salaries and benefits just to support the UT Southwestern physicians in the NICU, while also paying UT Southwestern $4 million in uncompensated care payments for that NICU, a total $8 million benefit for a 45-bed NICU unit. Relator knows that the former payments are reflected on the UT Southwestern Medicaid RVU schedule paid to UT Southwestern by Children's for Medicaid RVUs for NICU docs, while the latter payments appear in the NICU APP cost center on Children's books. Children's even paid UT Southwestern $825,000 (in FY 2018) to manage Children's APPs, as reflected in the parties' "CHST-UTSW Economic Work Stream, Purchased Services: Medical Administration" summary at 11. By comparison, another children's hospital in the area (Cook Children's Medical Center in Fort Worth) paid only about $1 million in outside physician coverage for an 80-bed NICU, with the physicians providing their own APPs.

176. The contribution of free services provided by Children's to UT Southwestern do not fall within any of the safe harbors set forth at 42 C.F.R. §1001.952. For example, the provision of free services does not constitute "personal services" or services provided pursuant to an exempt management contract for at least five reasons. First, the aggregate compensation paid to UT Southwestern in the form of free services is not set in advance. Second, the aggregate compensation paid is not fixed and reflected in a written agreement signed by the parties. Third, the amount of free services indirectly takes into account the volume of business generated between the parties—the more orders for hospital services that the UT Southwestern physicians write for patients, the more APP support is required. Fourth, by definition, the provision of "free services" cannot reflect fair market value. Fifth, the services are being provided on an as-needed

46

basis, with no written agreement specifying the schedule according to which the services will be delivered. 42 C.F.R. §1001.952(d)(1), (3), (5).

177.    Though the APPs are employed by Children's, it is the UT Southwestern physicians who direct them and assign their tasks, which often involve taking first call for the UT Southwestern physicians contracted to provide call coverage.  APPs also perform physicals, and both pre- and post-op care, primarily in the PICU, NICU, and CICU.  While a small percentage of APPs assigned to specialty clinics bill for their services (garnering 92% of the reimbursement that the physician does), Relator has learned that almost all APP services are billed to Medicare and Medicaid by the UT Southwestern physicians, under their provider numbers.

178.    That the UT Southwestern physicians were billing for APP-performed services is confirmed in a summary of the "CHST-UTSW Economic Work Stream," a document which summarizes various "funds flow" agreements between Children's and UT Southwestern.  This document indicates that the parties created an exception to the policy of providing APPs at no charge to UT Southwestern in the new William P. Clements ICU and certain surgical units. As to those APPs only, a funds flow agreement existed in which UT Southwestern repaid Children's for APP services ($3.1 million in FY 2018) billed by the UT Southwestern physicians. Described as "UTSW APP Recharge and Lease Payments," the reimbursement to Children's is calculated "based on *collected professional fees and UCC payment* (when applicable) per RVU for defined pre- and post-op care."  These collected professional fees must be those paid to the UT Southwestern physicians, but which are being recognized as fees that should have been billed for by the Childrens'-employed APPs, and are therefore an appropriate measure to use to calculate the "recharge payment."  The fact that UT Southwestern was paying for APPs in the Clements ICU and certain surgical units *but not everywhere* confirms that UT Southwestern physicians were obtaining free APP services in the other hospital units.  Relator learned that the UT Southwestern physicians would then bill —and obtain reimbursement for—professional fees for services performed by these APPs.

179.    This fact was confirmed for Relator in approximately November 2018, when he met with Children's Chief Compliance Officer and Vice President for Accreditation and Regulatory Affairs, Javier Montemayor. As Chief Financial Officer at Children's, Relator wanted to understand why Children's was paying the salaries and benefits for so many APPs, and he specifically wanted to know who was billing for the services these APPs were providing.

180.    Mr. Montemayor had audited claim forms submitted for services provided to Children's patients by Children's APPs, finding that UT Southwestern physicians were billing for these Children's APP-delivered services. He also determined that physicians were copying and pasting the APP's progress notes into the space on the claim form where the physician's progress notes are to be entered, a practice he described as "pervasive." As discussed below, the UT Southwestern physicians were cutting and pasting the notes entered by residents and hospitalists as well. Mr. Montemayor confirmed that his review indicated that cutting and pasting was done to support the bill being submitted.

181.    Relator has learned that Children's chose not to lock the function in its electronic medical records system (EPIC) that prevents the cutting and pasting of notes—a practice that would have prohibited the UT Southwestern physicians' practice of copying and pasting the APPs' notes in the chart. It would also have prohibited those physicians from representing the APP notes as his or her own when submitting the reimbursement claim, falsely conveying the impression that the physician was involved in the decision-making about a patient's care.

182.    Such billing clearly violates Medicare rules; when provided in the hospital setting, physicians are not permitted to bill Medicare for the services of a nurse or other advanced practice provider under any circumstances, even if the supervision requirements of "incident to" billing are otherwise satisfied. CMS Medicare Claims Processing Manual, Ch. 12, ¶¶30.6.8 (C); 30.6.9.1 (D); 30.6.9.2 (E) (documentation must reflect that physician personally performed the hospital service being billed for).

183.    Medicaid is more flexible, allowing the physician to bill for the APP services so long as he or she "make[s] a decision regarding the client's care or treatment on the same date of

service as the billable medical visit." If no such decision is made, the physician may still bill, but must add the "SA" modifier to the claim form. 1 TAC §354.1062(d)(1). Texas Medicaid Provider Procedures Manual (April 2020) "Medical and Nursing Specialists, Physicians, and Physician Assistant," §8.2 (Vol. 2).

184.     Children's practice of providing a full staff of APPs for the UT Southwestern physicians to deploy as they see fit without contributing to their salaries or benefits, and then to bill for these APP-provided services under their own NPI number, amounts to a significant financial incentive. Like the practice of topping-up the physicians' Medicaid reimbursement to make them "whole," the provision of these free services had the purpose and effect of inducing the UT Southwestern physicians to spend their time treating Children's patients (as opposed to those at other UT Southwestern affiliate hospitals), and to order additional services (labs, diagnostic tests, etc.) for those patients that will be performed at Children's, providing it with additional opportunity to bill Medicare and Medicaid for those services.

185.     More than 25 years ago, the OIG recognized that where the provision of free services results in a benefit to the provider (UT Southwestern), the anti-kickback statute is implicated. If offered or accepted in return for the referral of Medicare or State health care plan business (Medicaid), both the offeror of the free services and the recipient may be violating the anti-kickback statute. There is no statutory exception or "safe harbor" to immunize any party to such a practice because the Federal programs do not realize the benefit of these "free" services, and because the amount or value of the free service is not set in advance or reflective of the fair market value for those services. *See, e.g.*, 42 CFR §1001.952(d)(personal services safe harbor); §1001.952(h)(3)(iii) (discount safe harbor). OIG Special Fraud Alert, Fed. Reg.  (Dec. 19, 1994); Final Rule, Office of Inspector General, 56 Fed. Reg. 35952 (July 29, 1991) (promulgating Anti-Kickback Statute safe harbors; with the discount safe harbor, "We did not propose to protect many kinds of marketing incentive programs such as cash rebates, free goods or services, redeemable coupons, or credits").

49

186.    The provision of free staff services not only allowed UT Southwestern physicians to bill for services provided by others, but it allowed the medical school to avoid the costs associated with hiring its own advanced practice providers or hospitalists.

187.    Children's made the payments for the free staff support—APPs, residents, and hospitalists—though it was reluctant to do so.  However, Relator knows that UT Southwestern took the position that its physicians would not cover Children's ICU units if the various payments and subsidies made by Children's did not continue.  He was told by Matt Davis, Children's Executive Vice President for the Dallas market, that the above-described practices could not stop because Children's would have no way of replacing the UT Southwestern physicians, who treated patients in the 450-bed hospital.

188.    In return for the many subsidies it received from Children's, UT Southwestern physicians referred most or all of their pediatric patients requiring hospitalization or ancillary hospital services (labs, x-rays, etc.) to Children's.

189.    In addition to the APPs, Children's also employs residents and hospitalists who provide services at its hospitals and clinics that are billed for by the UT Southwestern physicians.

190.    UT Southwestern sponsors a Pediatric Graduate Medical Education Residency Program, and by agreement with Children's, the hospital serves as the primary clinical setting for this pediatric residency.  UT Southwestern's pediatric residents join Children's hospital house staff so that they can fulfill the clinical education requirements of this residency.  Children's and UT Southwestern have a "history of jointly sharing in the academic investment, through employment of residents/fellows..." "CHST-UTSW Economic Work Stream, Purchased Services: Medical Administration" at 19.

191.    According to the Graduate Medical Education Pediatric Resident Agreement between the individual residents, Children's, and UT Southwestern, Children's pays the residents an annual stipend ($62,207 in 2017) plus benefits and the costs associated with the resident's acquisition of a Physician-in-Training license.  Children's subsidy of the residents was $9.6

million in FY 2018. "CHST-UTSW Economic Work Stream, Purchased Services: Medical Administration" at 20.

192.    Though Children's pays the residents, UT Southwestern's faculty directs them, not only educating them but determining their schedule. The Resident Agreement executed for each individual resident expressly states that UT Southwestern's Department of Pediatrics and its Program Director "will supervise and manage the Resident's schedule and education consistent with the Standards established by the ACGME, including, but not limited to, the distribution of the Resident's assignments and responsibilities."

193.    In addition to APPs and residents, the UT Southwestern physicians bill for services provided by hospitalists ultimately employed by Children's. Though Texas's "corporate practice of medicine" prohibitions do not permit Children's to employ physicians directly, Children's owns several health organizations authorized by Texas Occupations Code §162.001(b), organizations which are organized and incorporated by hospitalist physicians. Among these entities is Dallas Physicians Medical Services for Children ("DPMSC"), of which Children's is its sole "member." As DPMSC's IRS Form I-990 confirms, "Children's Health System of Texas is the sole member for Dallas Physician Medical Services for Children (DPMSC). Therefore, DPMSC's top management official, other officers, and key employees are employed and compensated by Children's Health System of Texas (CHST)."

194.    Like the advanced practice providers, these hospitalists treat patients at Children's, working frequently in the PICU during the winter. These hospitalists were indirectly employed by Children's, which paid for their salaries and benefits through DPMSC.

195.    The hospitalists' coverage schedule was determined by UT Southwestern. However, UT Southwestern would not permit the hospitalists to bill for the services they provided. In fact, UT Southwestern placed a provision in its bylaws prohibiting any physician not possessing an ICU certification from either covering ICU patients or billing for services provided to them. So UT Southwestern was scheduling hospitalists to cover ICU patients

51

knowing that, pursuant to the by-laws, those hospitalists would not be permitted to bill for their services, leaving the UT Southwestern physicians to bill for them.

196.    Ordinarily, the physician providing Medicaid services must be the one to bill for them.  1 TAC §354.1001(a), (b)(1), (11).  A physician may bill for the services of another Texas-licensed physician who sees patients in the billing physician's practice under either a reciprocal or locum tenens arrangement, so long as the billing physician documents the substitute physician's name and on the claim.  1 TAC §354.1062(e).  However, the period for which services of a substitute physician may be billed is 14 days (if the services were provided under a reciprocal arrangement) or 90 days (if the services were provided under a locum tenens agreement).  *Id.* at (e)(4).

197.    The DPMSC physicians did not have a reciprocal agreement with the UT Southwestern physicians, nor were they seeing patients in the various ICU units at Children's as locum tenens.

198.    While UT Southwestern physicians billed for the services provided by the APPs, residents and hospitalists, those physicians would then order additional services for these patients—surgeries, diagnostic tests, and other hospital services—to be performed at Children's. Children's submitted reimbursement claims for such services, billing for them despite knowing that the services had been ordered by physicians who had been provided illegal remuneration and with whom it had a financial relationship—physicians who should not be referring patients to it (or ordering services for them) at all under the Stark Law.

199.    The contract for the provision of services to Children's patients by UT Southwestern physicians creates a non-exempt financial compensation relationships between Children's and the physicians on the faculty of UT Southwestern, relationships that prohibit those physicians from referring patients to Children's for specific treatment or services.  Making such referrals, and accepting them, violated both the Stark and Anti-Kickback statutes, and rendered the claims submitted for such patients false because their accompanying certifications were false.

200. Each time a UT Southwestern physician submitted a reimbursement claim on

CMS-1500 form or its electronic equivalent, he or she certified:

> **Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.**
>
> ...
>
> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available from the Medicare contractor...4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark Law)...
>
> ....
>
> **SIGNATURE OF PHYSICIAN (OR SUPPLIER):** I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.
>
> NOTICE: this is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

CMS-1500 at 2.

201. Similarly, when enrolling as a Medicaid provider, Children's certified that: Provider understands that payment of a claim by Medicaid is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law), and on the provider's compliance with all applicable conditions of participation in Medicaid.

202. By billing for services performed by others—Children's APPs, hospitalists and residents provided at no charge to UT Southwestern and its physicians—the UT Southwestern physicians were billing for services tainted by kickbacks, rendering their certifications false. The reimbursement claims were also false because the physician's portion of the medical record was, in most cases, simply a copy of the notes entered by the APP, hospitalist, or resident, due to the "pervasive" practice of cutting and pasting those notes in the EPIC medical record system.

203.    Children's caused the submission of these false claims by providing illegal remuneration in the form of free services, which were intended to induce UT Southwestern physicians to refer patients to it, and to order further hospital services to be performed by (and billed for by) Children's.

204.    In addition, by virtue of the contract for the provision of services to Children's patients by UT Southwestern physicians, Children's has established non-exempt financial compensation relationships with physicians on the faculty of UT Southwestern, relationships that prohibit those physicians from referring patients to Children's for specific treatment or services. Making such referrals, and accepting them, violated both the Stark and Anti-Kickback statutes, and rendered the claims submitted for such patients false because their accompanying certifications were false.

## COUNT ONE
### Federal False Claims Act, 31 U.S.C. §3729(a)(1)(A)
### (Knowingly Presenting a False or Fraudulent Claim; all Defendants)

205.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

206.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq. for violations of §3729(a), the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b), and the Stark Law, 42 U.S.C. §1395nn.

207.    As specifically alleged above, Defendants knowingly submitted, or caused to be submitted, claims tainted by the offer, payment and/or acceptance of illegal remuneration under the Anti-Kickback Statute, and by referrals prohibited under the Stark Law. By virtue of these acts, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval.

208.    The United States was unaware of the foregoing circumstances and conduct of Defendants, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendants.

209. No safe harbors apply to relieve Defendants of liability. 42 C.F.R. §1001.952(b), (d).

210. The inpatient and outpatient hospital services provided as alleged above are "designated health services" under the Stark Law, while the agreements between Children's and Parkland, and between Children's and UT Southwestern (including specifically their "funds flow" agreement), constitute "compensation arrangements" prohibited under the Stark Law. 42 C.F.R. §411.354(c). None of the exceptions to the prohibition on referrals articulated in 42 U.S.C. §1395nn(e) apply here.

211. The compensation paid to the UT Southwestern physicians under the "Medicaid Make Whole" program or through Children's practice of providing them free services (APPs, residents and hospitalists) does not fall under the "bona fide employment relationship" exception to the Stark Law because Children's—the entity making the payments to UT Southwestern—is not the "employer" of the UT Southwestern physicians. 42 U.S.C. §1395nn(e)(2); 42 C.F.R. §411.457(c).

212. That compensation also does not fall under the "personal service arrangements" exception to the Stark Law because the compensation to be paid over the term of the agreement is not fixed and set in advance, but varies according to the volume of Medicaid patients treated, and because by definition, the provision of "free services" cannot reflect fair market value 42 U.S.C. §1395nn(e)(3)(A)(v); 42 C.F.R. §411.457(d)(1)(v).

213. Defendants' conduct violated 31 U.S.C. §3729(a)(1)(A) and by virtue of the false or fraudulent claims that Defendants presented or caused to be presented, the United States suffered damages and is therefore entitled to treble damages under the False Claims Act, to be determined at trial.

214. Additionally, the United States is entitled to the maximum civil penalty for each violation, as adjusted by law.

## COUNT TWO
### False Claims Act, 31 U.S.C. §3729(a)(1)(B)
**(Knowingly Making or Using False Record or Statement to Cause Claim to be Paid; all Defendants)**

215. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

216. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used, false records and statements material to false or fraudulent claims, in violation of 31 U.S.C. §3729(a)(1)(B).

217. The United States was unaware of the foregoing circumstances and conduct of Defendants, and unaware of the falsity of the records and or statements made, used, or caused to be made or used by Defendants, and in reliance on the accuracy thereof, paid the false or fraudulent claims submitted to it.

218. Defendants' conduct violated 31 U.S.C. §3729(a)(1)(B) and by virtue of the false or fraudulent claims that Defendants caused to be made, the United States suffered damages and is therefore entitled to treble damages under the False Claims Act, in an amount to be determined at trial.

219. Additionally, the United States is entitled to the maximum civil penalty for each violation, as adjusted by law.

## COUNT THREE
### Conspiring to Violate the False Claims Act, 31 U.S.C. §3279(a)(1)(C)
**(all Defendants)**

220. All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

221. As part of the schemes alleged above and the agreements to obtain reimbursement from the United States in violation of federal laws, Defendants and UT Southwestern, the unnamed co-conspirator identified herein, conspired to provide illegal remuneration, to make and receive prohibited patient referrals in violation of the Anti-Kickback Statute and/or the Stark Law, to present false claims, and to make false records to cause the United States to pay claims

for health care services based on false claims and false statements that the services were provided in compliance with all laws regarding the provision of health care services whereas they were not so provided.

222.    Defendants' conduct violated 31 U.S.C. §3729(a)(1)(C), and by virtue of the Defendants' conspiracy to defraud the United States, the United States suffered damages and is therefore entitled to treble damages under the False Claims Act, in an amount to be determined at trial.

223.    Additionally, the United States is entitled to the maximum civil penalty for each violation. as adjusted by law.

### COUNT FOUR
**False Claims Act, 31 U.S.C. §3729(a)(1)(G)**
**(Reverse False Claims; all Defendants)**

224.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

225.    By virtue of the acts described above, Defendants and UT Southwestern, the unnamed co-conspirator identified herein, knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the government in violation of 31 U.S.C. §3729(a)(1)(G).

226.    As a result of Defendants' and their co-conspirator's acts, the United States suffered damages and is therefore entitled to treble damages under the False Claims Act, in an amount to be determined at trial.

227.    Additionally, the United States is entitled to the maximum civil penalty for each violation, as adjusted by law.

### COUNT FIVE
**Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §36.002**
**(Knowingly Making False Statements or Misrepresentations of Material Fact; all Defendants)**

228.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

229. This is a claim for civil remedies under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, *et seq.*

230. As specifically alleged above, Defendants knowingly submitted, or caused to be submitted, claims tainted by the offer, payment and/or acceptance of illegal remuneration under the Anti-Kickback Statute, by referrals prohibited under the Stark Law, and for violations of Tex. Hum. Res. Code § 32.039(b) and Tex. Occ. Code § 102.001(a).

231. As a result, Defendants committed unlawful acts by

(a) Knowingly making or causing to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, Tex. Hum. Res. Code §36.002(1);

(b) Knowingly concealing or failing to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized, Tex. Hum. Res. Code §36.002(2);

(c) Knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact concerning the conditions or operation of a facility in order that the facility may qualify for certification or recertification required by the Medicaid program, including certification or recertification as a hospital, Tex. Hum. Res. Code §36.002(4)(A)(i);

(d) Knowingly making, causing to be made, inducing, or seeking to induce the making of a false statement or misrepresentation of material fact concerning information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program, Tex. Hum. Res. Code §36.002(4)(B);

(e) Knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, money or other consideration as a condition to the provision of a service if the cost of the service is paid for, in whole or in part, under the Medicaid program, Tex. Hum. Res. Code §36.002(5);

(f) Knowingly engaging in conduct that constitutes a violation under Section 32.039(b), §36.002(13)

232.    No safe harbors apply to relieve Defendants of liability.  Tex. Hum. Res. Code § 32.039(x)(3), 42 C.F.R. §1001.952(b), (d).

233.    The inpatient and outpatient hospital services provided as alleged above are "designated health services" under the Stark Law, while the agreements between Children's and Parkland, and between Children's and UT Southwestern (including specifically their "funds flow" agreement), constitute "compensation arrangements" prohibited under the Stark Law.  42 C.F.R. §411.354(c).  None of the exceptions to the prohibition on referrals articulated in 42 U.S.C. §1395nn(e) apply here.

234.    The compensation paid to the UT Southwestern physicians under the "Medicaid Make Whole" program or through Children's practice of providing them free services (APPs, residents and hospitalists) does not fall under the "bona fide employment relationship" exception to the Stark Law because Children's—the entity making the payments to UT Southwestern—is not the "employer" of the UT Southwestern physicians. 42 U.S.C. §1395nn(e)(2); 42 C.F.R. §411.457(c).

235.    That compensation also does not fall under the "personal service arrangements" exception to the Stark Law because the compensation to be paid over the term of the agreement is not fixed and set in advance, but varies according to the volume of Medicaid patients treated, and because by definition, the provision of "free services" cannot reflect fair market value. 42 U.S.C. §1395nn(e)(3)(A)(v); 42 C.F.R. §411.457(d)(1)(v).

236.    The State of Texas was unaware of the foregoing circumstances and unlawful acts of Defendants, and in reliance on the accuracy of said false or fraudulent claims, made payments to Defendants, which resulted in the State of Texas being damaged in an amount to be determined at trial.

237.    Defendants are jointly and severally liable to the State of Texas for the amount of any payments, or the value of any monetary or in-kind benefits, provided under the Medicaid program, directly or indirectly, as a result of their unlawful acts; two times the amount of those payments or the value of the benefit; pre-judgment interest on the amount of those payments or

the value of the benefit; and a civil penalty for each unlawful act committed, in addition to the fees, expenses, and costs of the Attorney General and the Relators in investigating and obtaining civil remedies in this matter. Tex. Hum. Res. Code §§36.052, 36.007, 36.110 (c).

## COUNT SIX
### Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.002(12), 32.039(b)
### (Knowingly Making or Using False Record or Statement to Cause Claim to be Paid; all Defendants)

238.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

239.    This is a claim for civil remedies under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, *et seq.*

240.    By virtue of the acts described above, Defendants knowingly made, used, or caused the making or use of a false record or statement material to an obligation to pay or transmit money or property to the State of Texas under the Medicaid program, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of Texas under the Medicaid program get the false and fraudulent claims allowed and paid, in violation of Texas Human Resources Code §36.002(12).

241.    The State of Texas was unaware of the foregoing circumstances and conduct of Defendants, and unaware of the falsity of the records and or statements made, used, or caused to be made or used by Defendants, and in reliance on the accuracy thereof, paid the false or fraudulent claims submitted it, which resulted in the State of Texas being damaged in an amount to be established at trial.

242.    Defendants' conduct violated Texas Human Resources Code §36.002(12) and caused the State of Texas to sustain damages in an amount to be determined at trial.

243.    Defendants are jointly and severally liable to the State of Texas for the amount of any payments, or the value of any monetary or in-kind benefits, provided under the Medicaid program, directly or indirectly, as a result of their unlawful acts; two times the amount of those payments or the value of the benefit; pre-judgment interest on the amount of those payments or

the value of the benefit; and a civil penalty for each unlawful act committed, in addition to the fees, expenses, and costs of the Attorney General and the Relator in investigating and obtaining civil remedies in this matter. Tex. Hum. Res. Code §§36.052, 36.007, 36.110 (c).

## COUNT SEVEN
### Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.002(9)
### (Conspiring to Submit False Claims or Records; all Defendants)

244.    All allegations set forth in this Complaint are incorporated into this Count as if fully set forth herein.

245.    This is a claim for civil remedies under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code §§36.001, *et seq*.

246.    As part of the schemes alleged above and the agreements to obtain reimbursement from the State of Texas, Defendants and UT Southwestern, the unnamed co-conspirator identified herein, conspired to provide illegal remuneration, to make and receive prohibited patient referrals in violation of the Anti-Kickback Statute and/or the Stark Law, to present false claims, and to make false records to cause the State of Texas to pay claims for health care services based on false claims, false records and false statements certifying that the services were provided in compliance with all laws regarding the provision of health care services when they were not so provided.

247.    By and through the acts described above, Defendants and UT Southwestern, their nondefendant co-conspirator, have conspired to commit violations of Tex. Hum. Res. Code §36.002, including but not limited to subsections (1), (2), (4), (5), (12), and (13).

248.    As a consequence of this illegal conspiracy, the State of Texas has suffered substantial damages in an amount to be determined at trial.

249.    Defendants are jointly and severally liable to the State of Texas for the amount of any Payments, or the value of any monetary or in-kind benefits, provided under the Medicaid program, directly or indirectly, as a result of their unlawful acts; two times the amount of those payments or the value of the benefit; pre-judgment interest on the amount of those payments or

the value of the benefit; and a civil penalty for each unlawful act committed, in addition to the fees, expenses, and costs of the Attorney General and the Relator in investigating and obtaining civil remedies in this matter. Tex. Hum. Res. Code §§36.052, 36.007, 36.110 (c).

## PRAYER FOR RELIEF

WHEREFORE, Relator prays for judgment in his favor and against Defendant as follows:

250.    That Defendants cease and desist from violating 31 U.S.C. §§3729, *et seq.*;

251.    That Defendants cease and desist from violating Tex. Hum. Res. Code §§ 36.001, *et seq.*;

252.    That judgment be entered in favor of the UNITED STATES OF AMERICA and the STATE OF TEXAS ex rel. RICHARD GOODE, and against all Defendants, as follows:

a)  For damages and penalties as provided by 31 U.S.C. § 3729(a)(1), in the amount of:

    i.    Triple the amount of damages sustained by the Government;

    ii.    Civil penalties as authorized by law for each false claim;

    iii.    Recovery of costs;

    iv.    Pre- and post-judgment interest.

b) For damages and penalties as provided by Tex. Hum. Res. Code §36.052 in the amount of:

    i.    Double the amount of damages sustained by the State;

    ii.    Civil penalties as authorized by law for each false claim;

    iii.    Interest;

c) For such other and further relief as the Court deems just and proper.

d) Pursuant to 31 U.S.C. §3730(d), for the Relator's share of the proceeds of this action or settlement of this action collected by the United States in the maximum amount as permitted by law, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

e)      Pursuant to Texas Human Resources Code §36.110, for the Relator's share of the proceeds of this action or settlement of this action collected by the State of Texas in the maximum amount as permitted by law, plus an amount for reasonable expenses incurred, plus reasonable attorneys' fees and costs of this action. Relator requests that his percentage be based upon the total value recovered, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

Relator hereby demands trial by jury as to all issues so triable.

Respectfully submitted July 13, 2020:

WATERS & KRAUS, LLP

Charles S. Siegel
TX Bar No. 18341875
Caitlyn Silhan
TX Bar No. 24072879
3141 Hood Street
Suite 700
Dallas, Texas 75219
Tel. 214-357-6244
Fax. 214-871-2263
siegel@waterskraus.com
csilhan@waterskraus.com

*Attorneys for Plaintiff-Relator Richard Goode*

JS 44 (Rev. 06/17)

SEALED ORIGINAL

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

(SEALED)

**DEFENDANTS**

(SEALED)

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Charles S. Siegel and Caitlyn E. Silhan, Waters & Kraus, LLP, 3141 Hood St.,Suite #700, Dallas, TX 75219; (214) 357-6244

Attorneys *(If Known)*

RECEIVED
JUL 13 2020
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☒ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 U.S.C. § 3729 et seq., 42 U.S.C. § 1395nn, 42 U.S.C. § 1320-7b(b)

Brief description of cause:
False and fraudulent Medicare and Medicaid claims; violations of Stark Law and Anti-Kickback Statute

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

DATE
07/13/2020

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

[ Print ]   [ Save As... ]   [ Reset ]